ALFONSO DIAZ AND MARIA DE JESUS DIAZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 714–71. Filed June 29, 1972.

*Wayne Windle*, for the petitioners.

*Ralph V. Bradbury, Jr.*, and *Douglas R. Fortney*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $1,621,220.23 in petitioners' income tax for 1966. The only issue for decision is whether Alfonso Diaz, one of the petitioners herein, was

---

the owner of winning tickets in the September 16, 1966, Mexican National Lottery.

### FINDINGS OF FACT

Some of the facts have been stipulated and, along with the exhibits in support thereof, are incorporated by reference.

The petitioners are husband and wife and were residents of Juarez, Mexico, at the time their petition herein was filed. They filed their 1966 joint income tax return with the district director of internal revenue at Austin, Tex. Maria de Jesus Diaz is a party to this proceeding only by reason of having joined in such return. Any references herein to "petitioner" shall be deemed to refer to Alfonso Diaz.

Petitioner was born in El Paso, Tex., but was raised in his grandmother's house in Juarez, Mexico, until he was 13 or 14, at which time he moved back to El Paso and resided with his mother at the Hotel Fisher, where she was employed as manager. After graduating from high school in El Paso, petitioner attended the American Institute of Banking and, in May of 1961, began working for the El Paso National Bank. From October 1965 to September 16, 1966, petitioner worked as a shipping clerk in El Paso; his take-home pay was over $100 per week. He lived with his wife, their two children, and his mother at the Hotel Fisher. His wife was 7 or 8 months pregnant in August—September 1966.

Jose Amado Diaz (hereinafter referred to as Jose) is one of petitioner's three maternal uncles. He is a citizen of Mexico and has always resided in Juarez, Mexico, with his mother (petitioner's grandmother), two sisters, four children of one sister, and a maid.

Jose suffers from severe myopia, walks with a limp, and has no formal education beyond the fourth grade in grammar school. He is a very religious man and has attended church daily since he was a child. In addition, he makes an annual pilgrimage to Mexico City to pay homage to the Virgin of Guadalupe, the patron saint of Mexicans.

Prior to 1966, Jose worked as an errand boy in a Juarez shoe store for 15 years; from January of 1966 until the end of April 1966, he worked as an errand boy for a Juarez photography store. His salary at both places was 150 pesos per week, or $12.

Jose loved to save money, and, inasmuch as his two sisters were making enough money to support the household, he was never asked to contribute to its upkeep. His sisters, brothers, and Alfonso used to give him spending money every Sunday. Because of his thriftiness, he was able to lend money to other members of his household

when they needed it; he was usually repaid at the time they received their next paycheck. By August of 1966, Jose had accumulated at least $150 in American money and a like sum in pesos.

The Mexican National Lottery for September 16, 1966, was one of several "grand" lotteries held throughout the year; there were smaller weekly drawings as well. Tickets for the September 16 lottery could be purchased individually or in sheets. Each sheet contained 25 tickets, all bearing the same number; each number in the September 16 lottery was printed on three sheets. Thus, on any given number, there were 75 tickets and an individual could purchase from one to 75 tickets bearing the same number, subject to their availability. Each ticket in the September 16 lottery cost 50 pesos, or $4. The cost of three sheets, therefore, was 3,750 pesos, or $300.

Several days prior to August 6, 1966, Jose had a dream in which the Virgin of Guadalupe told him to buy lottery number 37281. When he next saw petitioner, Jose told him about his dream and asked him for help in obtaining that number, since Jose felt that petitioner's superior education and experience would be helpful in this undertaking. Jose and petitioner then went to see Edmundo Valdez, the Juarez representative of the Mexican National Lottery, in order to ascertain the whereabouts of number 37281. In response to their inquiry, Valdez sent a telegram, dated August 6, 1966, to the Department of Distribution and Sales of the lottery, located in Mexico City, soliciting information as to the location of number 37281. A few days later, they again visited Valdez and learned that the number Jose desired was in Monterrey. On August 16, 1966, petitioner sent a telegram in his name to the lottery office in Monterrey reserving "all three sheets containing No. 37281" for the September 16 drawing. Petitioner appended Jose's address to the telegram. A money order dated August 21, 1966, was sent to the Monterrey lottery office in the amount of 3,750 pesos, or 300 American dollars. It indicated that, upon receipt of the money order, all of the tickets bearing number 37281 were to be sent to "Alfonso Diaz, 1213 Texcoco, Juarez." All of the money used to pay for the tickets belonged to Jose. All 75 tickets bearing number 37281 were sent, with a covering letter dated August 22, 1966, in an envelope addressed as indicated above. Upon receipt, Jose opened the envelope and placed the tickets in a metal box, where he kept his cash savings and other personal belongings and where they remained at least until the night of September 15, 1966.

The drawing of the winning numbers in the lottery occurred on September 15, 1966, and the principal results were announced on the late news show at 11 p.m. on that date. Jose and his mother were lis-

tening to the news and became very excited when number 37281 was announced. In their excitement, they were unable to find the key which opened the metal box in which the tickets were contained, and Jose pried it open with a screwdriver. There was no telephone in their house, and Jose, although he wanted petitioner's help in cashing the tickets, decided to wait until the next day before phoning him. When Jose telephoned the next morning, petitioner's mother told him that petitioner had already left for work but that she would call petitioner there and tell him that he should go see Jose; Jose told her that he had won the lottery but did not know how much he had won.

After hearing of Jose's good fortune, petitioner went to Juarez on September 16, 1966. When he arrived, petitioner found his uncle and grandmother excited and nervous. To enable Jose to cash his tickets, petitioner and Jose left by bus that afternoon for Monterrey and arrived the next day, September 17, which was a Saturday.[1] Jose wore two pairs of pants on the journey and carried the tickets in the pockets of the undermost pair; they were attached by several safety pins.

Inasmuch as the banks in Monterrey were closed for the weekend, petitioner and Jose stayed in Monterrey until Monday, September 19, when they presented the winning tickets to the Mexican Commercial Bank of Monterrey, S.A. (hereinafter the bank) for collection. After deduction for taxes, Jose was left with 31,835,126.25 pesos; this sum was deposited in a checking account in his name only.

Jose and petitioner then flew to Mexico City and, on Tuesday, September 20, went to visit the personnel of the investment department of the bank.

After counseling with petitioner, to whom he looked for advice, Jose placed 30 million pesos, or $2,400,000, on deposit with the bank at a guaranteed interest rate of 9 percent for a minimum time period of 1 year. At the bank's suggestion, petitioner was given signatory powers. In addition, every instruction sent to the bank by Jose required the signature of petitioner. It was Jose's intention that petitioner, because of his superior education and business background, manage the money for him. Petitioner never withdrew any of the funds on his own signature.

Subsequently, 24,183,000 pesos, or $1,934,640, was invested in long-term time certificates at interest rates varying between 9.625 and 10.60 percent per annum. Under the terms of these agreements, only Jose can endorse the certificates affecting a transfer of the funds to another party and, in any event, the funds cannot be withdrawn from the bank prior to the expiration of the applicable time period. At all times, Jose has had complete control over the initial disposition of the monthly in-

---

[1] Monterrey is 700 miles from Juarez.

terest payments; petitioner has had none. Presently, the time certificates are producing about $15,000 per month interest, all of which is paid into a checking account against which either petitioner or Jose may draw checks.

There is also the equivalent of another $816,000 invested in Mexican corporate securities.

Various members of the family, including petitioner, receive monthly allowances from the aforementioned checking account. None of them works any longer. Other members of the family receive money also whenever they need it.

Some time subsequent to September 16, 1966, petitioner renounced his United States citizenship in order to own property in Mexico, inasmuch as Mexico has certain prohibitions regarding ownership of such property by foreigners. At that time, he took up residence in Juarez, Mexico, where he has since resided.

Jose, his mother, his two sisters, and the four children of one sister still live in the same house as they did in 1966. It is Jose's mother's wish to remain in the house (built for her by her husband) until she dies, and her wishes are being respected. Petitioner lives in a modest house of his own with his wife, mother, three children, and a maid.

### ULTIMATE FINDING OF FACT

Jose Amado Diaz was the owner of the winning lottery tickets.

### OPINION

This case epitomizes the ultimate task of a trier of the facts—the distillation of truth from falsehood which is the daily grist of judicial life. He must be careful to avoid making the courtroom a haven for the skillful liar or a quagmire in which the honest litigant is swallowed up. Truth itself is never in doubt, but it often has an elusive quality which makes the search for it fraught with difficulty. That this is so is clearly illustrated by the situation herein. Many of the objective facts are as consistent with a finding that the lottery tickets belonged to petitioner as they are with a finding that they belonged to his uncle, Jose; indeed, some of these facts support the former conclusion, for which respondent strenuously contends. If this were all we had to go on, we would be inclined to hold that petitioner had failed to sustain his burden of proof. But we also have before us an extensive transcript of oral testimony. The question is whose testimony and how much of it should we believe.

We have a vivid recollection of the trial itself. Such recollection has revitalized the written record (a document having the characteristics of "a dehydrated peach," see *Broadcast Music* v. *Havana Madrid Res-*

*taurant Corp.*, 175 F. 2d 77, 80 (C.A. 2, 1949)) and has given perspective to our review thereof. That record reveals the story (told for the most part in Spanish through an interpreter) of a simple family coping with the commonplace problems of daily living against a backdrop of deep religious conviction and mysticism. Out of that conviction and mysticism came the miracle of sudden and substantial wealth through the ownership of a winning set of lottery tickets.[2] To be sure, the story unfolded principally through the testimony of petitioner, Jose, and other members of the family, all of whom ultimately benefited from that wealth and concededly had an interest in the outcome of this case. But the fact of the matter is that, despite some confusion, there was a consistent thread to their testimony which supports the conclusion that petitioner's uncle owned the winning tickets. Beyond this, the testimony of petitioner's 86-year-old grandmother, who was also Jose's mother, was most convincing. Obviously closer than most to her Maker and face-to-face with her priest in the courtroom, she completely corroborated the essential elements of the testimony of petitioner and his uncle (her son)—testimony which she had not heard because witnesses were excluded from the courtroom.

In the final analysis, our decision herein rests upon our evaluation of the entire record and the credibility of the witnesses who appeared before us. On this basis, we are satisfied that Jose, not the petitioner, owned the winning lottery tickets.

*Decision will be entered for the petitioners.*

---

[2] Indeed, it might be possible to conclude that ownership of the tickets was vested in the family group, with the result that petitioner might be held to have received his pro rata share of the winnings. But this theory was not advanced either in the deficiency notice, at trial, or on brief.