T.C. Memo. 1999-408


UNITED STATES TAX COURT


ALFRED L. AND RENEE E. FIELDS, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  22011-97, 22012-97,    Filed December 15, 1999.
             22013-97, 22014-97.


<u>Douglas E. Kahle</u>, for petitioners.

<u>John C. McDougal</u> and <u>Dustin M. Starbuck</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  These cases were consolidated for trial,
briefing, and opinion.  Respondent determined deficiencies in

---

[1]     Cases of the following petitioners are consolidated
herewith:  Frank H. and Irma E. Bullock, docket No. 22012-97;
Leroy and Mattrude P. Sharpe, docket No. 22013-97; and Esker L.
Peacock, docket No. 22014-97.

petitioners' Federal income taxes, additions to tax, and penalties, as follows:

Alfred L. and Renee E. Fields, Docket No. 22011-97:

| Year | Deficiency | Additions to tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------|---------------------------------------|
| 1993 | $10,913 | $2,188 | $2,183 |
| 1994 | 18,871 | 4,718 | 3,774 |

Frank H. and Irma E. Bullock, Docket No. 22012-97:

| Year | Deficiency | Additions to tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------|---------------------------------------|
| 1993 | $12,510 | --- | $2,502 |
| 1994 | 21,422 | $967 | 4,284 |

Leroy and Mattrude P. Sharpe, Docket No. 22013-97:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1993 | $8,337 | $1,667 |
| 1994 | 18,467 | 3,693 |

Esker L. Peacock, Docket No. 22014-97:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1993 | $11,103 | $2,221 |
| 1994 | 19,403 | 3,881 |

After concessions, the issues for decision are: (1) Whether petitioners had unreported income during the years under consideration as determined by respondent; (2) whether petitioners in docket No. 22012-97 (the Bullocks) are entitled to losses claimed in connection with Frank Bullock's van pool activity; (3)

whether petitioners in docket Nos. 22011-97 and 22012-97 (the Fieldses and the Bullocks) are liable for additions to tax pursuant to section 6651(a)(1) for failure to timely file a return; and (4) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

All section references are to the Internal Revenue Code as in effect for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioners Alfred L. and Renee E. Fields, husband and wife, (the Fieldses) resided in Chesapeake, Virginia, at the time they filed their petition contesting respondent's determinations. The Fieldses filed their 1993 and 1994 Federal income tax returns late.

Petitioners Frank H. and Irma E. Bullock, husband and wife, (the Bullocks), Leroy and Mattrude P. Sharpe, husband and wife, (the Sharpes), and Esker L. Peacock (Mr. Peacock) all resided in Portsmouth, Virginia, at the time they filed their respective petitions contesting respondent's determinations. The Bullocks timely filed their 1993 Federal income tax return but filed their 1994 return late. Both the Sharpes and Mr. Peacock timely filed their 1993 and 1994 Federal income tax returns.

The 4 Leaf Corporation

The 4 Leaf Corporation (4 Leaf Corp.), a Virginia corporation, was incorporated on April 21, 1992. At all relevant times, 4 Leaf Corp. had its principal place of business in Hampton, Virginia (City of Hampton). During the years under consideration, Alfred Fields (Mr. Fields), Mr. Bullock, Leroy Sharpe (Mr. Sharpe), and Mr. Peacock each owned 25 percent of 4 Leaf Corp.'s outstanding stock.

On October 6, 1992, 4 Leaf Corp. leased a building located in Hampton, Virginia, which became known as the Buckroe Plaza Bingo Hall (Buckroe). It was originally intended that the building would be used for concerts, dances, bingo, and conferences. However, after the City of Hampton prohibited 4 Leaf Corp. from sponsoring a dance at the building, Buckroe was used exclusively as a bingo hall.

Bingo Operations at Buckroe

Under Virginia law (1) only "qualified organizations" (i.e., charitable and fraternal organizations) may operate bingo games, and (2) the workers at the games must be members of those charitable and fraternal organizations, working as volunteers. See Va. Code Ann. secs. 18.2-3450.1-4, 18.2-340.9 (Michie 1993).

During 1993, the bingo games at Buckroe were sponsored by two charitable organizations: The Association for the Restoration of Historic Cemeteries (the cemeteries restoration association) and

the Coalition for Community Pride and Progress (the community coalition). In 1994, a fraternal organization known as the Mighty O'Jays (the O'Jays) was added as a sponsor. (Messrs. Fields, Bullock, Sharpe, and Peacock were members of the O'Jays.) All three organizations (hereinafter collectively referred to as the sponsoring organizations) purportedly were qualified organizations for purposes of conducting bingo games under Virginia law.

During 1993 and 1994, bingo games took place at Buckroe twice a week. Each of the sponsoring organizations provided persons to work the bingo games. At different times, Messrs. Fields, Bullock, Sharpe, or Peacock helped train new floor workers, maintained the financial records, and were present at Buckroe during the bingo sessions.

As an accommodation, 4 Leaf Corp. purchased bingo supplies (i.e., game cards, chips, markers, etc.) from Bingo Products, Inc., and sold the supplies to the sponsoring organizations at cost. These supplies were subsequently sold, at a profit, to the bingo players.

At the end of an evening of bingo, "bingo accountability sheets" were used to record the aggregate cost of supplies and the amount paid out as prizes.[2] The bingo accountability sheets did

---

[2] There were no bingo accountability sheets for approximately 10 percent of the bingo games held in 1993 and 1994. Further, some of the information on the bingo

(continued...)

not separately account for each session of bingo but rather treated all three nightly sessions as a single undertaking.  All expenses for the supplies were borne evenly by the sponsoring organizations.

In 1994, the City of Hampton audited the bingo operations conducted at Buckroe.  The City of Hampton determined that the sponsoring organizations were not in compliance with State and local laws governing the operation of bingo games; changes were thereafter made in order to have the sponsoring organizations comply with the applicable laws.

Internal Revenue Service Examination

In early 1995, the Internal Revenue Service (IRS) began an examination of both 4 Leaf Corp. and petitioners as part of a "bingo project" jointly conducted by the IRS' Examination and Exempt Organizations Divisions.  The agent coordinating the bingo project, Revenue Agent Gross, requested Mr. Bullock to produce the records of 4 Leaf Corp.; Mr. Bullock told Revenue Agent Gross to see Mr. Schefletle, 4 Leaf Corp.'s accountant.  Because the records of 4 Leaf Corp. were incomplete, Mr. Schefletle had to reconstruct the corporation's general ledger and income statements.  The only revenues reported on the reconstructed corporate books and on 4

---

[2](...continued)
accountability sheets was incomplete and/or absent.

Leaf Corp.'s tax returns for 1993 and 1994 were rents from Buckroe and income from the operation of a snack bar at the hall.

As part of the IRS examination, Revenue Agent Gross and other agents interviewed between 15 and 20 workers at the bingo games held at Buckroe. The revenue agents attempted to obtain records of the bingo operations from the sponsoring organizations but were unsuccessful. Consequently, the IRS reconstructed the income from the bingo games held at Buckroe by the percentage markup method, based on bingo supplies purchased for the games. The determined profit was based, in part, on information obtained from the Bingo Bulletin (a commercial publication for the bingo industry) which published the sales prices for the various products sold during the games and prize payouts.[3] On the basis of the aforementioned methodology, respondent determined the gross income, total expenses, and net income from bingo operations at Buckroe for 1993 and 1994 as follows:

|  | 1993 | 1994 |
|---|---|---|
| Gross receipts | $979,080 | $1,720,614 |
| Expenses | 859,123 | 1,502,540 |
| Net income | 119,957 | 218,074 |

After allowing a reduction in net income for "illegal payments to workers" and after allowing payments to each of the sponsoring

---

[3] The bingo games at Buckroe were advertised in the Bingo Bulletin, as well as the prices charged for packages of bingo cards and the prize payouts.

organizations, respondent determined that there was cash ($54,416 for 1993 and $106,038 for 1994) available for distribution to Messrs. Fields, Bullock, Sharpe, and Peacock, computed as follows:

|                                      | 1993       | 1994        |
|--------------------------------------|------------|-------------|
| Net income                           | $119,957   | $218,074    |
| Less: payments to workers            | (62,841)   | (101,010)   |
| Less: payments to charities          | (2,700)    | (11,025)    |
| Net income available for distribution | 54,416    | 106,039     |

## The Bullocks' Van Pool Activity

During 1993 and 1994, and for approximately 8 years prior thereto, Mr. Bullock operated a van pool in which he provided transportation to and from work to a number of individuals in exchange for a predetermined fee. Mr. Bullock operated the van pool between his residence in Portsmouth, Virginia, and both the Naval Air Station in Norfolk, Virginia, and the Newport News Shipyard in Newport News, Virginia.

Mr. Bullock owned the van used in the van pool activity. He drove the van from Portsmouth to Norfolk, where he was employed as a supply clerk. Another person drove the van from Norfolk to the Newport News Shipyard. This other person was permitted to ride for free.

Other than canceled checks for expenses paid out of Mr. Bullock's personal checking account, Mr. Bullock did not maintain contemporaneous records of the expenses incurred in operating the

van pool. (These canceled checks were not introduced into evidence.) Mr. Bullock failed to maintain a mileage log or a separate bank account for his van pool activities.

Mr. Bullock prepared a summary of his income and expenses at the end of each year for use by his tax return preparer. On their 1993 and 1994 Federal income tax returns, the Bullocks reported income, expenses, and net losses from the van pool activity as follows:

|  | 1993 | | 1994 | |
|---|---|---|---|---|
| Gross receipts | | $6,020 | | $2,007 |
| Expenses: | | | | |
|     Depreciation | $980 | | $1,517 | |
|     Insurance | 3,000 | | 3,000 | |
|     Supplies | 75 | | --- | |
|     Repairs | --- | | 1,170 | |
|     Taxes | 403 | | 1,213 | |
|     Other | 6,285 | | 3,900 | |
|   Total expenses | | 10,743 | | 10,800 |
|   Loss | | (4,723) | | (8,793) |

## IRS' Position and Determinations

Respondent determined that Messrs. Fields, Bullock, Sharpe, and Peacock each received unreported cash distributions from 4 Leaf Corp. from the bingo operations conducted at Buckroe. The amounts now ascribed to each of them from these activities by respondent are $13,604 for 1993 and $26,509.75 for 1994. (The deficiencies in tax as set forth in the notices of deficiencies were based on greater amounts of purported unreported income.)

With respect to the Bullocks, respondent disallowed the van pool losses (1) for lack of substantiation of the expenses, and (2) on the basis of respondent's determination that the Bullocks lacked a profit objective for the activity. The Bullocks did not appear at trial, and there was no evidence offered to substantiate any of the expenses deducted on their returns with respect to the van pool activity.

OPINION

Issue 1:  Reconstruction of Petitioners' Income

The underlying dispute presented herein relates to respondent's reconstruction of income purportedly generated by the bingo operations conducted at Buckroe, and respondent's allocation of that reconstructed income to Messrs. Fields, Bullock, Sharpe, and Peacock. Petitioners adamantly maintain that all proceeds, net of rent and administrative expenses incurred in connection with the operation of the bingo games, went to the three sponsoring organizations, and not to them or to 4 Leaf Corp.

The methodology used by respondent in reconstructing the purported bingo income--the percentage markup method--is a time-honored, judicially accepted method of reconstructing income. See Bernstein v. Commissioner, 267 F.2d 879 (5th Cir. 1959), affg. T.C. Memo. 1956-260; Stone v. Commissioner, 22 T.C. 893 (1954); Cebollero v. Commissioner, T.C. Memo. 1990-618, affd. 967 F.2d 986 (4th Cir. 1992). Although in theory respondent's methodology was

reasonable, we believe that here it did not produce a correct result.

In Diaz v. Commissioner, 58 T.C. 560, 562 (1972), we noted that the process of distilling truth from the testimony of witnesses is the daily grist of judicial life. At trial, we observed Messrs. Fields, Sharpe, and Peacock as they testified, and we had the opportunity to evaluate their credibility. We found their testimony to be credible.

On the basis of their testimony, and that of others, we are convinced that all proceeds of the bingo games, net of expenses, went to the sponsoring organizations, not to petitioners. Respondent's evidence to the contrary was not convincing. Indeed, under respondent's "alternative method" which used the bingo accountability sheets, one could extrapolate that all net income from the bingo games went to the sponsoring organizations. Accordingly, we do not sustain respondent's determination that petitioners had unreported income for 1993 and 1994.

Issue 2: Losses From Van Pool Activity

We now address the losses claimed by the Bullocks arising from Mr. Bullock's van pool activity.

The parties have stipulated (1) the amounts of income and expenses reported on the returns for the activity, (2) Mr. Bullock's driving of the van coincided with his own commute, and (3) no contemporaneous records were maintained. The record is

devoid of any other facts about the operation of the van pool, such as the number of passengers and the amounts, if any, charged to each.

In the notice of deficiency, respondent disallowed the expenses of the van pool operation to the extent they exceeded reported income on the grounds that the amount and deductibility of such expenses had not been substantiated.  In addition, respondent disallowed the van pool losses on the grounds that Mr. Bullock did not enter into the van pool arrangement with an "actual and honest objective of making a profit."  Beck v. Commissioner, 85 T.C. 557, 569 (1985); see sec. 1.183-2(a), Income Tax Regs.

Petitioners bear the burden of substantiating the amount and deductibility of expenses claimed on their returns.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  There is no evidence in the stipulation of facts or in the trial record to show the amount or business purpose of any of the van pool expenses claimed on the Bullocks' returns. Consequently, we sustain respondent's disallowance of the claimed  Schedule C deductions by the Bullocks for the van pool activity.

Issue 3:  Additions to Tax and Penalties

The remaining issues relate to additions to tax and penalties; i.e., whether (a) the Fieldses and the Bullocks are liable for additions to tax for failure to timely file a return under section 6651(a)(1), and (b) whether all petitioners are liable for the

section 6662(a) accuracy-related penalties for the years in issue for negligence or disregard of rules or regulations or substantial understatement of tax.

Section 6651(a)(1) imposes an addition to tax of 5 percent of the amount of tax due per month for each month that a tax return is not timely filed. An exception is made for taxpayers demonstrating reasonable cause. Section 6662(a) imposes a penalty equal to 20 percent of the amount of the underpayment attributable to negligence or disregard of rules or regulations or substantial understatement of tax.

On brief, respondent concedes that if we find that there is no unreported income from bingo operations, then there are no additions to tax for late filing or penalties for negligence due from any of the petitioners except the Bullocks. Because we have concluded that there is no unreported income from the bingo operations, the Fieldses are not liable for the addition to tax under section 6651(a)(1), and the Fieldses, Sharpes, and Mr. Peacock are not liable for the accuracy-related penalties under section 6662(a) for the years in issue.

The Bullocks have failed to present any credible evidence to rebut respondent's determination of the accuracy-related penalty or the addition to tax attributable to the disallowed Schedule C deductions from the van pool activity. See Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989) (holding that the taxpayer

bears the burden of establishing that he is not liable for the accuracy-related penalty); Espinoza v. Commissioner, T.C. Memo. 1999-269 (holding that the taxpayer bears the burden of proof on the issue of a section 6651 addition to tax.)  Accordingly, we sustain respondent's determination that the Bullocks are liable for the section 6651(a)(1) addition to tax to the extent of the underpayment relating to the disallowed Schedule C deductions for 1993 and 1994.  We likewise sustain respondent's determination that the Bullocks are liable for the accuracy-related penalties under section 6662(a) for both years.

In reaching our conclusions herein, we have considered all arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing and respondent's concessions,

Decisions will be

entered under Rule 155.