T.C. Memo. 2000-149

UNITED STATES TAX COURT

QUANTUM COMPANY TRUST, LONNIE D. CROCKETT, TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DAVID C. NORTON AND LOIS K. NORTON, a.k.a. KIM Z. NORTON,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 185-98, 186-98.          Filed April 25, 2000.

John Robertson Riley, for petitioners.

Kay Hill, for respondent.

MEMORANDUM OPINION

JACOBS, Judge:  These cases were consolidated for purposes of
trial, briefing, and opinion.  Pursuant to separate notices of
deficiency, respondent determined the following deficiencies and
accuracy-related penalties:

Quantum Co. Trust, Lonnie D. Crockett, Trustee, docket No. 185-98:

|  | | Accuracy-Related Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1993 | $10,124 | $2,025 |

David C. and Lois K. Norton, a.k.a. Kim Z. Norton, docket No. 186-98:

|  | | Accuracy-Related Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1993 | $123,751 | $24,750 |

The parties now agree that the income reported by Quantum Co. Trust for 1993 ($28,000) is properly reportable on the Schedule C, Profit or Loss From Business, of the 1993 Federal income tax return of David C. and Lois K. Norton (the Nortons). Consequently, respondent concedes that no deficiency or penalty exists with respect to Quantum Co. Trust for 1993. Further, the parties resolved many of their differences giving rise to the deficiency respondent determined against the Nortons. After giving effect to concessions by each of the parties, the issues remaining for decision are: (1) With respect to calculating the profit from David C. Norton's (Mr. Norton's) construction activities conducted through his sole proprietorship known as Northridge Construction (Northridge) in 1993, (a) whether Northridge's gross receipts were underreported by $86,155, (b) whether Northridge's 1993 cost of goods sold is greater than the amount stipulated by the parties, and (c) whether the Nortons are entitled to a deduction for travel expenses in an amount greater than allowed by respondent; (2)

whether proceeds from the settlement of a lawsuit arising out of Mr. Norton's fishing activities are excludable from income pursuant to section 104(a)(2); (3) whether statutory prejudgment interest the Nortons received in connection with a personal injury award is excludable from income pursuant to section 104(a)(2); (4) whether the Nortons are entitled to a $15,000 deduction for an ostensible payment of environmental cleanup expenses made in connection with their acquisition of rental property; and (5) whether the Nortons are liable for the accuracy-related penalty.

All section references are to the Internal Revenue Code as in effect for the year under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

The Nortons, husband and wife, resided in Palmer, Alaska, at the time they filed their petition. Quantum Co. Trust's mailing address at the time the trustee thereof filed a petition was Palmer, Alaska.

During 1993, Mr. Norton was engaged in two unrelated business activities--construction of residential and commercial buildings (through Northridge) and commercial fishing. Northridge operated as a general contractor with respect to the construction of

residential and commercial buildings.  The income and expenses from these activities were reported by the Nortons on separate Schedules C.

All receipts received from Mr. Norton's construction and fishing activities were deposited into a business checking account maintained at the National Bank of Alaska (NBA). A total of $2,356,263.15 was deposited into the NBA account during 1993.

For clarity, we have combined our remaining findings of fact and opinion for each of the issues to be resolved.

Issue 1.  Amount of Northridge's Profit for 1993

Three items remain to be resolved in order to calculate the profits from Mr. Norton's construction activities:  (1) The amount of gross receipts; (2) the amount for cost of goods sold; and (3) the amount for travel expenses.

A.  Gross Receipts

Pamela Ennis Crockett (Mrs. Crockett) prepared the Nortons' Federal income tax return for 1993.  Utilizing bank deposit slips and Forms 1099, Mrs. Crockett determined Northridge's gross receipts for 1993 to be $1,205,232.57, calculated as follows:

| | | |
|---|---|---|
| Total deposits | | $2,356,263.15 |

Less:

| | | |
|---|---|---|
| Fishing income | $25,084.19 | |
| Loans from family | 86,155.52 | |
| Nontaxable transfers | 144,011.70 | |
| Nontaxable deposits | 867,697.92 | |
| Nontaxable estate | 81.25 | |
| Quantum Trust income | 28,000.00 | |
| | | 1,151,030.58 |
| Gross receipts | | [1]1,205,232.57 |

[1]  The parties stipulated that Northridge's gross receipts should be increased by $28,000, representing Quantum Co. Trust's income for 1993.

Respondent maintains that Northridge's 1993 gross receipts are $86,155 greater than determined by Mrs. Crockett.  Specifically, respondent disputes the Nortons' claim that $86,155 of the NBA deposits represents nontaxable loans from Mr. Norton's brother, a friend, and family members.  We thus must determine the source (loans vs. gross receipts) of the $86,155 deposit.

The characterization of the $86,155 depends upon our accepting the testimony of Mr. Norton as truthful.  Mr. Norton testified that he and his wife emerged from bankruptcy in 1993, and to alleviate their financial burden, they borrowed moneys from Mr. Norton's brother (Steve), a friend (Jim Sullivan), and unnamed family members.  According to Mr. Norton, he and his wife agreed to repay the loans with 8 percent interest.  No notes or collateral were given.

Once again, we are required to distill truth from falsehood. See Diaz v. Commissioner, 58 T.C. 560, 564 (1972). Having observed Mr. Norton while he was testifying, we find his testimony as to the source of the $86,155 deposit credible. We are satisfied that there was a true debtor-creditor relationship and that this relationship created an unconditional and enforceable obligation to repay the moneys advanced. Consequently, we conclude that Northridge's gross receipts for 1993 were not underreported as respondent maintains.

### B. Cost of Goods Sold

The parties stipulated that Northridge's cost of goods sold for 1993 was $945,143, rather than $945,732, as reported on the Nortons' original and amended Schedules C. In arriving at this amount, the auditing agent reviewed substantiating documentation.

At trial, the Nortons sought an additional $4,650 for cost of goods sold, claiming that this amount was paid to David & Sons for cabinets and other items. In support of this claim, the Nortons introduced an undated invoice, as well as a copy of their check ledger. The check ledger for February 12, 1993, indicated that a check was made payable to "David & Sons" in the amount of $4,450. No canceled check to show that the $4,650 invoice was paid was introduced.

We do not believe that, in general, a party to a stipulation should be allowed unilaterally to disregard the stipulation. Even

so, here, the check ledger does not support the Nortons' claim for an additional $4,650 for cost of goods sold. The amount recorded on the check ledger ($4,450) differs from the invoice amount ($4,650). We are not convinced that Northridge's cost of goods sold for 1993 is greater than the amount stipulated. Consequently, we conclude that Northridge's cost of goods sold for 1993 is $945,143.

### C. Travel Expenses

No deduction for travel expenses was claimed on the original Schedule C for Northridge's activities. An amended Schedule C, however, reflects a deduction in the amount of $5,822 for travel expenses. During the audit, the Nortons submitted the following receipts to substantiate their claimed travel expenses:

| | |
|---|---|
| Overnight stay at Merit Inn | $88.00 |
| Check No. 13616 paid to VISA | 1,731.09 |
| Receipt Fantasia Travel | 3,800.00 |
| Check No. 13884 paid to VISA | 532.00 |

Respondent allowed only $88 of the claimed $5,822. The Nortons failed to introduce at trial any evidence to support their claimed business travel expenses.

Section 274(d) requires strict substantiation for travel expenses. Here, the Nortons failed to provide documentation or other corroborating evidence to support their claimed travel expenses. Consequently, we conclude that the Nortons are not entitled to a deduction for travel expenses in an amount greater than allowed by respondent.

Issue 2. Taxability of Settlement Proceeds From Fishing Lawsuit

On June 7, 1986, Mr. Norton was fishing for herring on Norton Sound by means of a beach seine. The open period for herring fishing on that date was 3 hours. While Mr. Norton and his crew were hauling in herring, they were informed by State Trooper John Harman (Officer Harman) that because the lead line was not fully on the beach as of the end of the 3-hour fishing period, they had to release their catch. Despite vigorously disputing Officer Harman's claim, Mr. Norton complied. As a result, Mr. Norton was dispossessed of approximately 150 tons of herring valued in excess of $100,000 and was denied "fish tickets", which are used for the subsequent assignment of limited entry fishing permits. (These permits are awarded by the Alaska Limited Entry Fisheries Commission (the commission) based upon the amount of fish landed and allow commercial fishermen to maintain and expand their fishing privileges.)

On June 2, 1988, Mr. Norton filed a lawsuit against Officer Harman (both individually and as a trooper of the State of Alaska Department of Public Safety, Division of Fish and Wildlife Protection) and the State of Alaska (the Harman lawsuit), seeking monetary and declaratory relief. The complaint contained six counts: (1) Trespass to chattels; (2) conversion; (3) negligence; (4) punitive damages; (5) deprivation of civil rights; and (6) a

declaratory judgment seeking adjudication of Mr. Norton's fishing rights.

The complaint sought the following monetary relief:

    a.    Compensatory damages for dispossession and/or conversion in excess of one hundred one thousand dollars ($101,000) to be determined more precisely at trial, and/or provision for a like occasion, period and opportunity to harvest fish from a herring biomass of similar size.

    b.    In the alternative, compensatory damages for negligence in excess of one hundred one thousand dollars ($101,000) to be determined more precisely at trial.

    c.    Punitive damages of one thousand dollars ($1,000).

    d.    Compensatory damages for deprivation of civil rights in excess of two hundred seventy thousand dollars ($270,000) to be determined more precisely at trial.

    *    *    *    *    *    *    *

    f.    Costs, attorneys' fees, prejudgment and postjudgment interest where appropriate, related actual expenses and any other relief in law or equity to which the plaintiff may be shown to be entitled.

In addition, the complaint sought a judicial determination that Mr. Norton's June 7, 1986, catch of herring was a "landed" catch for purposes of obtaining points awarded by the commission.

On December 22, 1992, the parties reached a tentative agreement to resolve the Harman lawsuit.  The release agreement, dated January 8, 1993, provided in relevant part:

    FOR AND IN CONSIDERATION of the sum of FORTY FIVE THOUSAND AND NO/100 DOLLARS ($45,000.00), and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, DAVID C. NORTON * * * does hereby release and forever discharge the STATE

OF ALASKA, DEPARTMENT OF PUBLIC SAFETY, JOHN HARMAN * * * of and from all actions, causes of action, suits, controversies, claims, and demands of every kind and nature, mature or to mature in the future, for and by reason of any damages, costs, expenses, and compensation, whether for insurance proceeds, personal injury, bodily injury, property damage, out-of-pocket expenses, loss of earnings, loss of use, loss of consortium, loss of services, attorney's fees, punitive damages, or bad-faith handling, or any other thing whatsoever, arising out of an incident occurring on or about June 10, 1986, and any and all claims embodied in <u>David C. Norton v. John E. Harmon [sic], et al.</u> * * *

* * * * * * *

This release notwithstanding, nothing in this agreement shall restrict the undersigned's right to apply * * * for a limited entry permit for the Norton Sound beach seine herring sac roe fishery, nor shall it prevent the undersigned from filing an administrative appeal with respect to such a permit * * *

The net amount Mr. Norton received in 1993 (after reductions for attorney's fees and costs) was $26,280. The Nortons did not report the settlement proceeds on their 1993 Federal income tax return.

In the notice of deficiency, respondent determined that the proceeds received from the settlement of the Harman lawsuit were taxable to Mr. Norton as compensation for lost fishing income.

Section 61(a) requires that taxpayers include in their gross income all income from whatever source derived, absent a contrary provision in the Internal Revenue Code (Code). Section 104(a)(2) is one such provision. Pursuant to section 104(a)(2), gross income does not include the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness.

The applicable regulations provide that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs. Thus, in order to exclude damages from gross income pursuant to section 104(a)(2), the taxpayer must prove: (1) The underlying cause of action is based upon tort or tort type rights, and (2) the damages were received on account of personal injuries or sickness. See Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995).

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such amounts are excludable from gross income under section 104(a)(2). The crucial question is "in lieu of what was the settlement amount paid"? Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). This determination is a factual inquiry. See Robinson v. Commissioner, 102 T.C. 116, 127 (1994), affd. in part, revd. in part on another ground and remanded 70 F.3d 34 (5th Cir. 1995).

We now turn our attention to the settlement that Mr. Norton received by virtue of the release agreement. Mr. Norton testified that he believed that the settlement was made on account of personal injuries. On the other hand, the attorney for the State

of Alaska testified that she viewed the settlement as a compromise of property-based claims.

From the face of the release agreement we are unable to ascertain whether the settlement was made on account of tort type personal injuries or in claims grounded elsewhere; the release agreement purports to release defendants from "all actions, causes of action, suits, controversies, claims, and demands of every kind and nature". Nor are we able to discern from the face of the release agreement the intent of the parties in reaching the agreement; the release agreement provided "it is the intention of the parties released * * * and it is the purpose of this agreement, to discharge absolutely the liability of the parties * * * from any and all the aforementioned claims". Accordingly, we must analyze the nature of the underlying claims.

First, we address whether the settlement was made on account of tort or tort type rights. This analysis requires us to focus on the scope of remedies available. See Cade v. Commissioner, T.C. Memo. 1999-394. "A 'tort' has been defined broadly as a 'civil wrong other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'" United States v. Burke, 504 U.S. 229, 234 (1992) (quoting Keeton et al., Prosser & Keeton on the Law of Torts 2 (5th ed. 1984)). Such action for damages is generally compensatory in nature. See id. at 235.

Of the six counts, five sought damages that directly addressed Mr. Norton's losses through tort type claims and remedies. These counts (i.e., trespass to chattels, conversion, negligence, punitive damages, and deprivation of civil rights--due process) are traditionally recognized as torts under Alaskan law and each provides remedies in the form of an action for compensatory damages. The sixth count, however, sought a declaratory judgment regarding Mr. Norton's fishing rights. Under Alaska law, a declaratory judgment determines a party's legal rights and relationships and does not provide an independent action for damages. See Alaska Airlines, Inc. v. Red Dodge Aviation, Inc., 475 P.2d 229, 232 (Alaska 1970). Accordingly, only five counts of the complaint state claims having tort or tort type characteristics.

The release agreement provided for $45,000 plus an arrangement whereby the State of Alaska would address Mr. Norton's disputed fishing rights. The similarity between the nature of the relief sought in the complaint and the relief afforded in the release agreement leads us to conclude that the provision in regard to fishing rights was made in settlement of the claim for declaratory judgment, and that the $45,000 was allocated to the remaining five counts. Consequently, we agree with the Nortons that the settlement proceeds arose from tort or tort type claims.

Although the existence of tort or tort type claims is necessary, that alone is not sufficient to enable the settlement proceeds to come within the ambit of section 104(a)(2); a showing that the $45,000 settlement was "on account of personal injury or sickness" is also required. See Commissioner v. Schleier, supra. Accordingly, we next address whether Mr. Norton recovered damages on account of traditional personal injury claims such as physical pain and suffering and/or emotional distress. See id. at 327.

In count one of the Harman complaint, Mr. Norton alleged the following: "As a result of this dispossession, the plaintiff was deprived of one hundred fifty (150) tons of herring * * * [in addition] [he] also suffered additional expenses and inconvenience for the use of his crew to release the catch." Counts two, three, and four alleged similar damages. In addition, the only damage counts five and six alleged related to the loss of valuable fishing "points". Moreover, no physical, mental, or emotional injuries were pleaded in the complaint. Accordingly, we conclude that the injury giving rise to the Harman lawsuit was economic in nature. The damages Mr. Norton sought were for the loss of anticipated profits from his fishing activities. Indeed, Mr. Norton's own attorney testified that Mr. Norton's primary objective in bringing the lawsuit was to protect his commercial fishing business. There is no evidence indicating that the settlement proceeds were

intended to remedy physical or emotional injuries arising from Officer Harman's actions.

In sum, we conclude that the settlement proceeds were paid in lieu of lost fishing income and not on account of personal injury or sickness. As a result, we sustain respondent's determination that the Harman settlement proceeds are gross income includable on the Nortons' Schedule C for 1993.

Issue 3. Taxability of Prejudgment Interest

On April 21, 1988, Mr. Norton was injured in an automobile accident. The Nortons sued both the driver and the vehicle owners (the Boehm lawsuit). On December 28, 1992, an amended final judgment was entered awarding the Nortons $95,235 in damages together with $45,298 in prejudgment interest, as well as attorney's fees and costs. The Nortons received the $95,235 in 1992; they received the $45,298 in 1993. The Nortons did not report either the damage award or the prejudgment interest on their 1992 or 1993 Federal income tax returns.

The parties agree that pursuant to section 104(a)(2), the $95,235 damage award is excluded from the Nortons' gross income. However, in the notice of deficiency respondent determined that the $45,298 in prejudgment interest is includable in the Nortons' gross income.

The Nortons claim that under Alaska State law, prejudgment interest is classified as damages and as such is excluded from

gross income pursuant to section 104(a)(2). See Alaska Stat. sec. 09.30.070 (Michie 1991). In contrast, respondent argues that prejudgment interest does not constitute an award of damages within the purview of section 104(a)(2).

We agree with respondent. Section 104(a)(2) excludes from gross income the amount of any damages (other than punitive damages) received on account of personal injuries or sickness. Section 104 is to be narrowly construed; it does not specify that interest is excluded from gross income. See Commissioner v. Schleier, 515 U.S. at 337; Kovacs v. Commissioner, 100 T.C. 124, 128-130 (1993), affd. without published opinion 25 F.3d 1048 (6th Cir. 1994). Conceptually, an award of damages is different from an award of interest on damages. See Rozpad v. Commissioner, 154 F.3d 1, 5-6 (1st Cir. 1998), affg. T.C. Memo. 1997-528; Aames v. Commissioner, 94 T.C. 189, 193 (1990); Greer v. Commissioner, T.C. Memo. 2000-25. The term "damages" connotes the "compensation or satisfaction imposed by law for a wrong or injury" while the term "interest" means "the price paid for borrowing [or withholding] money." Kovacs v. Commissioner, supra at 128 (quoting Webster's Third New International Dictionary (1986)); Smith v. Commissioner, 59 T.C. 107, 111-113 (1972). In the context of section 104(a)(2), "damages" do not include interest.

In sum, we hold that the $45,298 earmarked as "prejudgment interest" does not constitute damages within the meaning of section

104(a)(2). See, e.g., <u>Kovacs v. Commissioner</u>, <u>supra</u>; <u>Smith v. Commissioner</u>, <u>supra</u>. Consequently, the $45,298 is not excludable from the Nortons' gross income.[1]

<u>Issue 4. Deductibility of Deposit Into Controlled Savings Accounts</u>

On September 28, 1993, the Nortons agreed to purchase residential rental property in Big Lake, Alaska (Meadow Creek), from the Federal Deposit Insurance Corporation (FDIC) for $115,000. To finance the purchase of Meadow Creek, the Nortons borrowed $85,000 from NBA. As a condition for making the loan, NBA required the Nortons to deposit $15,000 in a controlled savings account pending third-party certification that environmental concerns regarding contamination by the previous owners of Meadow Creek had been corrected. On November 26, 1993, the Nortons caused $15,000 to be deposited into the controlled savings account. In order to have the funds released from this account, the Nortons had to either request reimbursement for cleanup expenses or pay off the loan in its entirety.

The Nortons incurred expenses in connection with removing contaminated soil and replacing concrete floors and drains from the Meadow Creek property. None of these expenses were paid in 1993.

---

[1] The parties stipulated "that to the extent the Court finds the prejudgment interest award taxable, the Nortons are entitled to deduct, as an itemized deduction, the allocable attorneys fees and court costs which were not paid by the defendants in the Boehm lawsuit or otherwise reimbursed and which have not been deducted either elsewhere on their return or in any other year."

In a letter dated May 9, 1996, the Nortons requested reimbursement for the following expenses from the controlled savings account:

| Vendor | Description | Amount |
|--------|-------------|--------|
| GeoCHEM, Inc. | Pit liner | $1,987.50 |
| Weld-Air | Angle iron and welding rod | 359.00 |
| Brad Zweifel Co. | Soil removal | 414.00 |
| Knapp Enterprises | Soil removal | 414.00 |
| Total | | 3,174.50 |

The requested amount was released to the Nortons. They paid off the NBA loan in 1999. At the time the loan was satisfied, the controlled savings account had a balance of $6,000 to $8,000; this amount was released to the Nortons.

Upon the advice of Mrs. Crockett, the Nortons offset their 1993 Schedule E income with a $15,000 deduction for environmental cleanup expenses. Respondent disallowed the claimed deduction.

Before a taxpayer is allowed a current deduction, a claimed expense must be paid or incurred. The Nortons are cash method taxpayers, and under such method expenses are deductible or capitalized only after such expenses have been actually paid. See sec. 1.461-1(a)(1), Income Tax Regs.

The Nortons did not incur or pay any environmental cleanup expenses in 1993.[2] Rather, they merely made a deposit into a controlled savings account. (The purpose of the controlled account

---

[2] Because the Nortons did not make any expenditures for environmental cleanup costs in 1993, the question of whether such costs would be currently deductible is moot.

was to ensure that the Nortons would not strip down the value of the bank's lien on the property by failing to remedy environmental hazards.)  The $15,000 deposit into the controlled savings account did not pay environmental cleanup costs.  Thus, we sustain respondent's determination on this issue.

Issue 5.  Section 6662(a) Accuracy-Related Penalty

The final issue is whether the Nortons are liable for the section 6662(a) accuracy-related penalty.

Section 6662 imposes a penalty equal to 20 percent of any portion of an understatement that is attributable to negligence or disregard of rules or regulations or substantial underpayment of tax.  See sec. 6662(a) and (b)(1).  "Negligence" includes any failure of the taxpayer to make a reasonable attempt to comply with the provisions of the Code, and "disregard" includes any careless, reckless, or intentional disregard of rules and regulations.  Sec. 6662(c).  The accuracy-related penalty will be imposed unless the taxpayers can demonstrate that there was reasonable cause and they acted in good faith with respect to the underpayment. See sec. 6664(c)(1).   In  determining  the  applicability  of  section 6664(c)(1), we weigh the particular facts and circumstances of each case.  See sec. 1.6664-4(b), Income Tax Regs.  One of the most important factors that we take into account is the extent of the taxpayer's effort to assess the proper tax liability.  See id.

We believe that the Nortons have sustained their burden of establishing reasonable cause and good faith. Numerous deductions disallowed by respondent in his notice of deficiency were subsequently conceded fully or in large measure by respondent. The Nortons were not tax sophisticated. As a result, they actively sought assistance in determining their tax liability. Although some of that advice was inaccurate, we accept Mr. Norton's testimony that they reasonably relied upon the advice of two attorneys as well as their tax preparer in reporting their income and expenses. Moreover, there is nothing in the record to indicate that the Nortons' conduct was negligent or undertaken in reckless disregard of applicable Code sections. Accordingly, we hold that the Nortons are not liable for the accuracy-related penalty.

In reaching our conclusions herein, we have considered all arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered for petitioner in docket No. 185-98</u>.

<u>Decision will be entered under Rule 155 in docket No. 186-98</u>.