T.C. Memo. 2000-178

UNITED STATES TAX COURT

KENNETH J. NISSLEY AND TERRI C. CONNOR-NISSLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20757-98.                    Filed May 30, 2000.

<u>W. Curtis Elliott, Jr.</u>, <u>William R. Culp, Jr.</u>,
and <u>Niles A. Elber</u>, for petitioners.

<u>Timothy S. Sinnott</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, <u>Special Trial Judge</u>:  Respondent determined
deficiencies in petitioners' Federal income taxes for the taxable
years 1994, 1995, and 1996 in the amounts of $9,189, $9,446, and
$7,495, respectively.

The issue for decision by the Court is whether petitioners engaged in their Amway activity for profit within the meaning of section 183.[1]  We hold that they did not.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Indianapolis, Indiana, at the time that their petition was filed in this case.

Petitioner husband (Mr. Nissley) graduated in 1982 with a bachelor of science degree in accounting from Manchester College in North Manchester, Indiana.  He was licensed as a certified public accountant (C.P.A.) in 1982.  Thereafter, from 1982 through 1987 he worked as a staff auditor, a senior auditor, and ultimately as an audit manager for the Big 5 accounting firm of Price Waterhouse.

Since January 1988, Mr. Nissley has been employed on a full-time basis (40-50 hours per week) as the director of information systems and planning and procurement for Creative Expressions Group, Inc. of Indianapolis, Indiana.  His salary for 1994, 1995, and 1996 was $65,674, $67,916, and $70,810, respectively.

---

[1]  All section references are to the Internal Revenue Code, in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

Petitioner wife (Mrs. Nissley) graduated in 1983 with a bachelor of science degree in accounting from Indiana University. She was licensed as a C.P.A. in 1985.

Upon graduating from college, Mrs. Nissley began employment with Price Waterhouse, where she worked full time, providing consulting services (related to financial systems) to Fortune 500 companies. At the time that she resigned from the firm in 1991, she was a senior manager.

After her resignation from Price Waterhouse and through the middle of 1994, Mrs. Nissley served as the director of information systems for Administar Information Technologies of Indianapolis, Indiana, earning $57,467 in 1994. Thereafter, through the end of 1994, Mrs. Nissley was self-employed as a business consultant, earning a net profit of $23,193 (based on gross receipts of $31,735 and total expenses of $8,542) for that year. Her combined salary and net profit from self-employment in 1994 was $80,660.

In January 1995, Mrs. Nissley obtained a full-time position as president and chief executive officer of Pathway Family Center of Southfield, Michigan (Pathway), a nonprofit, health-care organization dedicated to the treatment and prevention of substance abuse by adolescents. Mrs. Nissley continued to hold this position at the time of trial (November 1999). Her salary for 1995 and 1996 was $75,010 per year.

During the years in issue, petitioners operated an Amway distributorship under the name of "KT Enterprises". Petitioners began their Amway activity in May or June 1991, when they were recruited as "downline" distributors by an "upline" distributor. At the time of trial, petitioners were continuing to pursue their Amway activity.

Amway is a supplier of household and personal use products that are sold by individuals (distributors) through direct marketing. An Amway distributor purchases Amway products for resale to both customers and "downline" distributors, as well as for personal use.

At least in theory, Amway distributors generate receipts by selling Amway products directly to customers and by recruiting new distributors. The new recruits become "downline" distributors of the sponsoring distributor and a part of his or her organization. (The sponsoring distributor is referred to as the "upline" distributor.) In turn, each "downline" distributor is encouraged to sponsor additional new distributors, all of whom become a part of the initial distributor's organization. (The process of recruiting new distributors is often referred to as "building the legs" of a distributor's network.) Amway does not assign exclusive geographical territories to any distributor, nor does Amway impose a minimum sales quota on any distributor.

Amway maintains a "pyramid" incentive system. Under this system, an "upline" distributor receives a bonus based on the volume of sales generated by his or her "downline" distributors.[2] Thus, the system presumes that the "upline" distributor's potential for profit will increase as his or her network of "downline" distributors becomes wider and deeper.[3]

Because the "upline" distributor's bonus is based on the volume of sales generated by "downline" distributors, such bonus is not directly affected by a "downline" distributor's profitability or lack of profitability.

The Amway "pyramid" incentive system is promoted by Amway in the form of the "6-4-2 plan". Under the "6-4-2 plan", each Amway distributor is encouraged to personally recruit 6 "downline" distributors, each of whom in turn is encouraged to recruit at least 4 "downline" distributors, each of whom in turn is encouraged to recruit at least 2 "downline" distributors (for a total of 78 "downline" distributors in the initial distributor's organization). Amway promotes the "6-4-2 plan" as the

---

[2] The "upline" distributor's bonus is also based on the volume of sales generated by the "upline" distributor himself or herself. However, the volume of such sales is generally minimal, and the portion of the bonus attributable to such sales is negligible.

[3] The "width" of a network refers to the number of "downline" distributors that are personally sponsored by the distributor in question, and "length" refers to the number of "downline" distributors that make up each "leg" of the network.

theoretical break-even point for a distributorship, assuming that the distributor and each "downline" distributor within the distributor's organization purchases $200 of Amway products per month, and that the distributor does not have expenses exceeding $2,000 per month. At least in theory, the potential for profit is enhanced as each of the 78 "downline" distributors in the distributor's network successfully implements the "6-4-2 plan".

The Amway "6-4-2 plan" does not provide meaningful guidance to distributors regarding how expenses incurred in pursuing an Amway activity might be reduced.

The structure of the Amway "pyramid" incentive system effectively serves to discourage distributors from spending their time personally trying to sell Amway products. In contrast, the system effectively serves to encourage distributors to spend their time trying to recruit an ever-increasing number of "downline" distributors. Petitioners themselves spent little time personally trying to sell Amway products and concentrated instead on trying to recruit (and retain) "downline" distributors.[4] Gross income received by petitioners consisted principally of bonuses earned from the sale (or personal consumption) of Amway products by "downline" distributors.

---

[4] At the end of 1994, 1995, and 1996, petitioners had a total of 75, 77, and 79 "downline" distributors, respectively, in their organization.

As Amway distributors, petitioners were entitled to purchase for their personal use Amway products at distributor's cost without the customary 30-percent markup. In 1994, 1995, and 1996, petitioners purchased Amway products valued at $2,133, $3,282, and $3,786, respectively, for their personal use.

Since inception, petitioners have treated their Amway activity as a proprietorship on Schedule C, Profit or Loss From Business, of their Federal income tax return. Petitioners describe their activity on Schedule C as "product distribution" but do not identify the activity as an Amway distributorship.

Petitioners have never succeeded in earning a profit from their Amway activity. Rather, petitioners have consistently claimed losses from their Amway activity and have used such losses to offset their other income, principally salary (or net profit from business consulting) from their full-time positions. The following schedule reflects the losses claimed by petitioners from their Amway activity on Schedule C of their tax returns for 1991 through 1998:

| Year | Net Loss |
|------|----------|
| 1991 (part year) | $ 10,258 |
| 1992 | 27,726 |
| 1993 | 19,705 |
| 1994 | 27,407 |
| 1995 | 33,539 |
| 1996 | 27,787 |
| 1997 | 22,225 |
| 1998 | 19,107 |
| | $187,754 |

At the time of trial (November 1999), petitioners anticipated that for 1999, they would once again incur a loss from their Amway activity.

Petitioners determined their net losses from their Amway activity on Schedule C of their tax returns for 1991 through 1998 as follows:

|  | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Gross income[1] | $ 2,796 | $11,387 | $19,691 | $ 5,609 |
| Less: expenses (incl. home office) | 13,054 | 39,113 | 39,396 | 33,016 |
| Net loss | $10,258 | $27,726 | $19,705 | $27,407 |

|  | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|
| Gross income[1] | $12,524 | $17,129 | $ 7,302 | $ 7,584 |
| Less: expenses (incl. home office) | 46,063 | 44,916 | 29,527 | 26,691 |
| Net loss | $33,539 | $27,787 | $22,225 | $19,107 |

[1]For petitioners, gross income was essentially the bonuses earned from the sale (or personal consumption) of Amway products by "downline" distributors. Petitioners themselves sold relatively few Amway products, although they did order such products on behalf of "downline" distributors.

Petitioners claimed expenses related to their Amway activity on Schedule C of their tax returns for 1991 through 1998 as follows:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Bad debts | --- | --- | --- | $ 835 |
| Car expenses | --- | $ 8,170 | $10,173 | 6,794 |
| Commissions/fees | $ 1,083 | 5,064 | 8,286 | 4,379 |
| Interest expense | --- | --- | --- | 672 |
| Office expense | 2,497 | 5,478 | 10,646 | 6,587 |
| Repairs | --- | 62 | --- | --- |
| Supplies | 4,257 | 7,875 | 1,517 | — |
| Travel | 4,915 | 7,637 | 5,633 | 4,858 |
| Meals/entertainment[1] | 302 | 794 | 1,024 | 1,002 |
| Utilities | --- | --- | --- | 4,861 |
| Other expenses | | | | |
|   Awards/gifts | --- | 57 | --- | --- |
|   Books/subscriptions/ | | | | |
|     tapes | --- | --- | --- | 369 |
|   Seminars | --- | 1,384 | --- | 1,394 |
| Use of home | | 2,592 | 2,117 | 1,265 |
|   Total expenses | $13,054 | $39,113 | $39,396 | $33,016 |

[1]Net after 20 percent reduction for 1991-93 and 50 percent reduction for 1994 per sec. 274(n).

| | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|
| Advertising | $ 2,078 | $ 326 | $ 1,105 | $ 952 |
| Car expenses | 13,214 | 11,070 | 8,604 | 7,839 |
| Commissions/fees | 6,461 | 5,152 | 864 | --- |
| Depreciation | 679 | 517 | 539 | --- |
| Interest expense | 488 | --- | 458 | 423 |
| Legal/professional | --- | --- | 310 | --- |
| Office expense | 8,371 | 11,026 | 5,796 | 5,942 |
| Supplies | 676 | 3,985 | 3,712 | 4,856 |
| Travel | 6,664 | 5,287 | 4,596 | 3,872 |
| Meals/entertainment[1] | 2,125 | 1,466 | 1,496 | 989 |
| Other expenses | | | | |
|   Books/subscriptions/ | | | | |
|     tapes | 992 | 884 | --- | --- |
|   Seminars | 1,805 | 2,376 | 2,047 | 1,818 |
|   Uniforms | --- | 342 | --- | --- |
| Use of home | 2,510 | 2,485 | --- | --- |
|   Total expenses | $46,063 | $44,916 | $29,527 | $26,691 |

[1]Net after 50 percent reduction for 1995-98 per sec. 274(n).

For the years in issue, petitioners claimed "car expenses" for a 1993 Oldsmobile and/or a 1994 BMW 535i based on claimed "business" miles driven.  Petitioners reported "business" miles, commuting miles, and other mileage on Schedule C of their tax returns for the years in issue as follows:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| "Business" miles | 23,398 | 38,277 | 29,945 |
| Commuting | 4,320 | 3,000 | 3,000 |
| Other | 2,603 | 2,456 | 4,957 |
| Total | 30,321 | 43,733 | 37,902 |

Petitioners claimed deductions for the cost of attending Amway conventions and seminars on a regular basis in cities such as New York, Denver, Atlanta, Orlando, and Minneapolis.

At the time that petitioners were recruited as Amway distributors in mid-1991, they had no prior experience with the Amway-type of activity.  Since that time, they have relied only on advice from one of their "upline" distributors and other interested Amway individuals.

Other than accepting the Amway "6-4-2 plan", petitioners did not maintain a written business plan for their Amway activity, nor did they maintain a written budget for the activity. Petitioners did not prepare a break-even analysis for their Amway activity, nor did they maintain a monthly report of expenses incurred in pursuing the activity.

A major reason why many individuals remain committed to Amway is the congenial sense of family and the gratifying motivational feeling that they derive from participating in the activity.

Petitioners have "no intentions of getting out of * * * Amway".

OPINION

Under section 183(a), if an activity is not engaged in for profit, then no deduction attributable to the activity shall be allowed except to the extent provided by section 183(b). In pertinent part, section 183(b) allows deductions to the extent of gross income derived from an activity that is not engaged in for profit.

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212". Deductions are allowable under section 162 or under section 212(1) or (2) if the taxpayer is engaged in the activity with the "actual and honest objective of making a profit". Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

The existence of the requisite profit objective is a question of fact that must be decided on the basis of the entire

record.  See Benz v. Commissioner, 63 T.C. 375, 382 (1974).  In resolving this factual question, greater weight is accorded objective facts than a taxpayer's statement of intent.  See Westbrook v. Commissioner, 68 F.3d 868, 875-876 (5th Cir. 1995), affg. T.C. Memo. 1993-634; sec. 1.183-2(a), Income Tax Regs.  For purposes of deciding whether the taxpayer has the requisite profit objective, profit means economic profit, independent of tax savings.  See Surloff v. Commissioner, 81 T.C. 210, 233 (1983).  The taxpayer bears the burden of proving that he or she engaged in the activity with the objective of making a profit.  See Rule 142(a); INDOPCO Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); Elliott v. Commissioner, 90 T.C. 960, 971 (1988), ("Petitioners bear the burden of proving that they engaged in the Amway distributorship with the intent to make a profit") affd. without published opinion 899 F.2d 18 (9th Cir. 1990).

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists.  These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar

activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs.

No single factor, nor even the existence of a majority of factors favoring or disfavoring the existence of a profit objective, is controlling.  See id.  Rather, the relevant facts and circumstances of the case are determinative.  See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Based on all of the facts and circumstances in the present case, we hold that petitioners have failed to prove that they engaged in their Amway activity for profit within the meaning of section 183.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, supra; Welch v. Helvering, supra; Elliott v. Commissioner, supra.

We will not analyze in depth all 9 of the factors enumerated in the regulation but rather focus on some of the more important ones that inform our decision.

First, the history of consistent and substantial losses incurred by petitioners in their Amway activity is indicative of a lack of profit objective.  See Golanty v. Commissioner, supra at 427; sec. 1.183-2(b)(6), Income Tax Regs.  Since the inception of their Amway activity in mid-1991, petitioners have never

earned a profit but have incurred losses for 8 consecutive years. Indeed, at the time of trial in November 1999, petitioners expected to incur another loss for what would be the ninth consecutive year.

Moreover, petitioners' losses have been substantial in amount, ranging between $19,107 and $33,539 for each of the 7 years during which petitioners have conducted their Amway activity for a full 12 months. Indeed, petitioners' aggregate losses for the 7-1/2-year period from mid-1991 through 1998 amount to $187,754 and average over $25,000 on an adjusted annual basis.

Further, there has not been any significant trend discernible in the history of petitioners' losses. For 1994 through 1996, the 3 taxable years in issue, petitioners incurred losses of $27,407, $33,539, and $27,787, respectively. While it is true that petitioners' losses have decreased since 1996, it is also true that a comparison of 1997 and 1996 demonstrates that petitioners' gross income decreased at a faster rate (57 percent) than did petitioners' expenses (34 percent). The same is true when 1998 and 1996 are compared.

Also relevant is the fact that "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening

years." <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). In the present case, there is no persuasive evidence that petitioners will enjoy "future net earnings", much less that petitioners will be able to recoup the substantial losses ($187,754 through 1998) "which have meanwhile been sustained".

Second, we are not convinced that petitioners conducted their Amway activity in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. Although petitioners may have maintained a separate bank account and records for their Amway activity, such bank account and records appear to have been maintained principally to satisfy substantiation requirements imposed by the Internal Revenue Code and thus to "guarantee" the deductibility of expenses. In contrast, such bank account and records do not appear to have been used as analytic or diagnostic tools in an effort to achieve profitability of petitioners' Amway activity. As we have previously stated:

> the keeping of books and records may represent nothing more than a conscious attention to detail. In this case, there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation. The petitioner reviewed her records, but she has failed to show that she used them to improve the operation of the enterprise. [<u>Golanty v. Commissioner</u>, <u>supra</u> at 430.]

Moreover, petitioners did not maintain certain types of records, nor did petitioners employ certain elementary business

practices, that one would expect of individuals pursuing an activity with a profit objective. See Ogden v. Commissioner, T.C. Memo. 1999-397; Theisen v. Commissioner, T.C. Memo. 1997-539; Hart v. Commissioner, T.C. Memo. 1995-55. Thus, petitioners did not maintain any written business plan for their Amway activity (other than the Amway "6-4-2 plan"). Further, petitioners did not maintain either a written budget or a monthly report of expenses, nor did petitioners prepare a break-even analysis.

Also of significance is the fact that petitioners had no experience with the Amway-type of activity prior to the time that they were recruited by an Amway distributor. See sec. 1.183-2(b)(2), Income Tax Regs. Since that time, petitioners have relied only on advice from one of their "upline" distributors and other interested Amway individuals. Yet, under the Amway system, the "upline" distributor's bonus is not directly affected by the "downline" distributor's profitability or lack of profitability; rather, it is the "downline" distributor's volume of sales that is important to the "upline" distributor. Nevertheless, petitioners have steadfastly refused to seek counsel from disinterested third parties regarding means by which their Amway activity might be made profitable. See Poast v. Commissioner, T.C. Memo. 1994-399 ("for the most part, petitioners' advisers were not experts as much as they were upliners with a financial

stake in petitioners' retail and downline sales."); Ogden v. Commissioner, supra ("Amway distributors may be biased when discussing Amway because they have a natural desire to advance the organization and/or obtain income from a downliner.").

Petitioners have steadfastly refused to seek counsel from disinterested third parties, even though the advice they have received from interested Amway individuals has done nothing to reverse petitioners' history of uninterrupted and substantial losses. Furthermore, the record suggests that the "advice" petitioners received has consisted of little more than platitudes, generalities, and encouragement to "stick with it".

Also noteworthy is the fact that after her resignation from Administar Information Technologies in mid-1994, Mrs. Nissley was able to generate immediately a net profit as a self-employed business consultant, earning $23,193 based on gross receipts of $31,735 and total expenses of $8,542, for the last 6 months of 1994. By contrast, in their Amway activity, petitioners have incurred nothing but substantial losses for 8 consecutive years.

Third, section 1.183-2(b)(8), Income Tax Regs., provides in part that "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or

recreational elements involved." Golanty v. Commissioner, 72
T.C. at 428-429; see Ransom v. Commissioner, T.C. Memo. 1990-381.

In the present case, petitioners are well-educated,
professional individuals, licensed as C.P.A.'s, who earn
substantial salaries from their full-time employment, as
demonstrated by the following table for the years in issue:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| Mr. Nissley | $ 65,674 | $ 67,916 | $ 70,810 |
| Mrs. Nissley | 80,660 | 75,010 | 75,010 |
| Total | $146,334 | $142,926 | $145,820 |

For 1994, 1995, and 1996, petitioners claimed losses from
their Amway activity in the amounts of $27,407, $33,539, and
$27,787, respectively. Petitioners used those losses to reduce
their compensation and other income, thereby decreasing their
taxable income and achieving substantial tax savings. Those tax
savings helped to finance everyday expenses such as outlays for
car and home.[5]

_____

[5] For 1994, 1995, and 1995, petitioners deducted car
expenses in the amounts of $6,794, $13,214, and $11,070,
respectively. For each of the first two of those years, the
amount deducted for just this single expense exceeded
petitioners' reported gross income from Amway for the year.
For 1994, 1995, and 1996, petitioners also claimed
deductions for use of home in the amounts of $1,265, $2,510, and
$2,485, respectively; for 1994, they also claimed a deduction for
utilities in the amount of $4,861. For 1994, the sum of just
these two deductions exceeded petitioners' reported gross income
from Amway for that year.

Finally, this Court has observed that "there are significant elements of personal pleasure attached to the activities of an Amway distributorship" and that "an Amway distributorship presents taxpayers with opportunities to generate business deductions for essentially personal expenditures."  Brennan v. Commissioner, T.C. Memo. 1997-60; see also sec. 1.183-2(b)(9), Income Tax Regs.; cf. sec. 1.183-2(b)(8), Income Tax Regs., regarding the reference to "personal or recreational elements" quoted above.

In the present case, the personal dimensions of petitioners' Amway activity indicate that such activity was not engaged in for profit.  The fact that petitioners have "no intentions of getting out of * * * Amway" underscores this conclusion.[6]

The record suggests that petitioners enjoy the same congenial sense of family and the same gratifying motivational feeling from participating in their Amway activity as do many other individuals who remain committed to Amway.  The record also suggests that Amway constitutes an important part of petitioners' social life.

In addition, during the years in issue, petitioners attended Amway conventions and seminars on a regular basis in cities such

---

[6]  Moreover, a taxpayer who intends to pursue an activity "no matter what" cannot be said to pursue the activity in a businesslike manner.  Sec. 1.183-2(b)(1), Income Tax Regs., discussed supra.

as New York, Denver, Atlanta, Orlando, and Minneapolis.  For the 3 years in issue, petitioners incurred expenses for travel, meals and entertainment (M&E), and seminars in the following amounts:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| Travel | $ 4,858 | $ 6,664 | $ 5,287 |
| M&E (gross) | 2,004 | 4,250 | 2,932 |
| Seminars | 1,394 | 1,805 | 2,376 |
| Total | $ 8,256 | $12,719 | $10,595 |

For 1994 and 1995, the total of just these amounts exceeds petitioners' reported gross income from Amway for those years.

Moreover, petitioners received a personal benefit from their Amway activity through the ability to purchase Amway products for their own use at distributor's cost without the customary 30-percent markup.  In 1994, 1995, and 1996, petitioners purchased, for their personal use, Amway products valued at $2,133, $3,282, and $3,786, respectively.  See Ogden v. Commissioner, T.C. Memo. 1999-397, where the purchase of $1,800 to $2,400 worth of Amway products per year for the taxpayers' personal use was regarded by the Court as a factor supporting the conclusion that the taxpayers lacked a profit objective.

Petitioners estimate that they devoted between 51 and 80 hours per week to their Amway activity, with Mrs. Nissley spending 21 to 40 hours per week and Mr. Nissley spending 30 to 40 hours per week.  Petitioners contend that devoting so much time to their Amway activity is indicative of a profit objective.

See sec. 1.183-2(b)(3), Income Tax Regs.  However, we regard petitioners' estimate as excessive.  See <u>Kropp v. Commissioner</u>, T.C. Memo. 2000-148 ("As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe."); see also <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986) ("we are not required to accept the self-serving testimony of petitioner * * * as gospel."); cf. <u>Diaz v. Commissioner</u>, 58 T.C. 560, 564 (1972). In any event, many individuals devote considerable time to their hobbies and similar activities.

In view of the foregoing, we hold that petitioners are not entitled to deduct the losses from their Amway activity for the years in issue.  However, pursuant to the provisions of section 183(b), petitioners are entitled to deduct expenses to the extent of gross income from their Amway activity.

We have carefully considered all of the contentions made by petitioners for a holding contrary to that expressed herein, and to the extent not touched on above, we find such contentions to be unpersuasive.

To give effect to the foregoing,

<u>Decision will be entered</u>

<u>under to Rule 155</u>.