T.C. Summary Opinion 2003-52

UNITED STATES TAX COURT

DAK, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4335-01S.                  Filed May 15, 2003.

Kenneth R. Chiate (an officer), for petitioner.

<u>Angelique Neal</u>, for respondent.

DINAN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in

effect for the fiscal year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioner's Federal income tax of $30,447 for the taxable year ended May 31, 1995, and an addition to tax pursuant to section 6662(a) in the amount of $6,089.40.

The issues for decision are: (1) Whether petitioner failed to report income in the amount of $120,371 for the year ended May 31, 1995; and (2) whether petitioner is liable for an accuracy-related penalty pursuant to the provisions of section 6662(a) in the amount of $6,089.40.

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference. Petitioner's principal place of business was in California on the date the petition was filed in this case.

## Background

DAK, Inc. (hereinafter petitioner) operates a restaurant in Malibu, California, known as Moonshadows Restaurant (Moonshadows). The restaurant is located on the Pacific Coast Highway in Malibu and overlooks the Pacific Ocean. The Moonshadows premises is owned by Dr. Robert Shlens (Dr. Shlens).

On October 1, 1991, Mr. Marvin Kelson (Mr. Kelson) was the principal of petitioner and entered into a lease with Dr. Shlens

to operate Moonshadows for a period of 15 years.  The lease provided that petitioner would pay a minimum rent of $120,000 per year.  The lease also required the payment of a percentage rent of 7-1/2 percent of annual gross sales if that amount exceeded the minimum rent of $120,000 per year.  The lease also provided that Dr. Shlens had the right to conduct an audit of Moonshadows's operations to verify the amount of its gross sales for any given period.

In 1992, Kenneth R. Chiate (Mr. Chiate) purchased Moonshadows from Mr. Kelson.  Mr. Chiate is an attorney.  He is now the president and sole shareholder of Moonshadows and purchased the business for reasons other than running the restaurant.  He has had nothing to do with the operation of the restaurant since he purchased it.

After Mr. Chiate purchased the restaurant from Mr. Kelson in 1992, Mr. Kelson became Moonshadows's accountant and bookkeeper from 1992 through 1995.

In early 1995, Dr. Shlens hired a certified public accountant, Ms. Cecy Groom (Ms. Groom) to audit petitioner's financial records.  She was to verify the gross sales reported to Dr. Shlens by petitioner in order to confirm that the amount of rent being paid to Dr. Shlens by petitioner was correct.  Ms. Groom's audit was initially directed to the period June 1994 through May 31, 1995 (the applicable period), but was extended to

include the years 1992 through 1996. Upon completing her audit, Ms. Groom submitted a comprehensive report to Dr. Shlens.

Moonshadows has a dining room and a bar area. During the applicable period, Moonshadows utilized two cash registers that recorded dining room sales (register 1) and bar sales (register 2).

To conduct her audit, Ms. Groom used the cash register tapes from registers 1 and 2 to determine petitioner's gross sales for the applicable period. She compared daily sales reported on sales journals, sales tax returns, financial statements, and petitioner's monthly reports that were given to Dr. Shlens. Ms. Groom also compared the cash register tapes with the daily dinner and bar sales tickets. She determined that Moonshadows had sales in the dining area of $1,298,418 from June 1, 1994, through April 30, 1995, and sales in the bar area of $380,520, for the same period. Ms. Groom's audit did not include the month of May 1995, because petitioner's records for that month were not available for analysis.

Ms. Groom also determined that for the period June 1, 1994, through April 30, 1995, the register tapes reported "other voids" and "voids and overrings" of $23,085 and $237,342, respectively.

In 1997, respondent commenced his audit of petitioner's tax year ended May 31, 1995. At that time, representatives of petitioner informed respondent that petitioner's sales records

for the fiscal year ended May 31, 1995, had been destroyed or misplaced. Having become aware of Ms. Groom's audit, respondent examined her audit report for the applicable period and adopted it in principal to determine petitioner's gross sales for the period June 1, 1994, through April 30, 1995. Respondent also relied upon petitioner's "Statement of Revenues, Expenses and Retained Earnings" for the month ended May 31, 1995.

After reviewing Ms. Groom's audit report and petitioner's "Statement of Revenues, Expenses and Retained Earnings" for the month ended May 31, 1995, respondent determined that petitioner had gross sales of $1,808,423 for the fiscal year ended May 31, 1995. From that amount, respondent allowed the following deductions:

| | |
|---|---|
| Sales tax | $108,318 |
| Other voids | 23,085 |
| Voids and overrings | 237,342 |
| | $368,745 |

Respondent deducted from the amount of gross sales ($1,808,423) the foregoing amount of $368,745 and calculated an amount of net gross sales of $1,439,678 for the applicable period. The record shows that petitioner does not challenge the amounts determined as deductions for sales tax, other voids, and voids and overrings.

On its Federal income tax return for the fiscal year ended May 31, 1995, petitioner reported income of $1,319,308. In his notice of deficiency dated January 3, 2001, respondent determined

that petitioner failed to report income for its fiscal year ended May 31, 1995, in the amount of $120,371.

## Discussion

We are asked to decide (1) whether petitioner may deduct from its gross sales for the taxable year ended May 31,1995, "double-ups" in the amount of $120,371 and (2) whether petitioner is liable for an accuracy-related penalty pursuant to the provisions of section 6662(a) in the amount of $6,089.40.

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving that it is entitled to any deduction claimed.[1]  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Deputy v. du Pont, 308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 6001 requires all taxpayers to maintain sufficient records to determine their tax liabilities.  When a taxpayer fails to maintain adequate books and records, respondent is entitled to reconstruct the taxpayer's income by any reasonable method.  Holland v. United States, 348 U.S. 121 (1954); Ferenc v. Commissioner, T.C. Memo. 1991-617, affd. without published opinion 9 F.3d 120 (11th Cir. 1993); sec. 1.6001-1(a), Income Tax Regs.

---

[1]  Because the examination of petitioner began prior to July 22, 1998, sec. 7491 burden of proof and production provisions do not apply.  See sec. 7491.

Testimony of Kenneth R. Chiate

Mr. Chiate is president and sole shareholder of Moonshadows. He described the restaurant and how it operated. There is a bar in Moonshadows that seats between 40 to 50 people. There is a cash register in the bar (register 2). That register would ring up drinks ordered by bar patrons.

If a patron were to leave the bar and go to the dining room for a meal, the bar ticket would follow the patron from the bar to the dining room. There was a cash register in the dining room (register 1). The server would then serve the patron his meal at the dinner table. If he wanted another drink during his meal, the server would go back to the bar with the patron's bar ticket and the bartender would add the drink to the bar ticket. The server would retain possession of the bar ticket. At the end of the meal, the server would add up the amount of the patron's dinner ticket and his bar ticket to compute the total owed by the patron for his meal and drinks.

Mr. Chiate testified that you cannot determine the total sales of the restaurant by adding up the dinner and bar cash register tapes because there would be "double-ups", i.e., the same charge for a drink would appear on the bar cash register tape and the dining room cash register tape.

Respondent asked Mr. Chiate if it were not true that you could look at the cash register tapes from the bar and determine

the amounts transferred to the cash register tapes in the dining room.  He was shown what had been received in evidence as Exhibit 15-P, a reconciliation of a bar register tape with the dining room register tape.  That exhibit reads as follows:

| | |
|---|---:|
| Gross | $1,035.81 |
| Key V | 156.06 |
| O.R. | 12.00 |
| Comp | 0.00 |
| Net | 867.75 |

Mr. Chiate was able to identify the gross as gross income from bar sales, the O.R. as overrings, the comp as complimentary drinks and the net as the result of subtracting the Key V, O.R., and comp amounts from gross sales to arrive at net bar sales.  He professed ignorance of the Key V code, however, stating: "I can't identify that code, Your honor.  I don't personally know what that code stands for."  Upon further cross examination by respondent, Mr. Chiate testified as follows:

  Q.  Okay.  Mr. Chiate, you just testified you don't know what a key V transaction is?

  A.  I don't know what that code is on the cash register, that's correct.

  Q.  Okay.  Do you know what O/R stands for on this document?

  A.  I believe O/R--on that document, I'm not certain, but I know that O/R was an abbreviation for over-ring that was frequently used in other documents. It may or may not be for this purpose.

  Q.  And comp?

  A.  Comp is when the bartender decided to complimentary provide a drink to a good customer, or

somebody who was unhappy with a meal, and a manager authorized a complimentary beverage, or meal.

     Q.  This is a reconciliation of the bar register, isn't that correct?

     A.  I'd have to look at the document.  I don't know.  I mean I'd have to compare all the tapes to determine for this particular day whether this is just the bar or not.

     Q.  Okay.  So you're not able to identify what's a bar tape and what's the register tape?

     A.  That's correct.

Finally, respondent asked:

     Q.  Okay.  So, just to clarify, it's your testimony today, well, essentially that you cannot tell from the register tapes if there's a double up?

     A.  Well, I think you can tell.  You may not be able to do it as precisely and certainly as the Service has requested, but I think that you can tell--

     Q.  Okay.

     A.  --that there's a double up.

Mr. Chiate then assumed the role of interrogator on behalf of petitioner.[2]  He called as petitioner's witness, Mr. Michael Ozenne.

Testimony of Michael Ozenne.

Mr. Ozenne is a C.P.A. who has an M.B.A.  He has had his own practice since 1971.  He began working for petitioner in 1997.  His assignment was to "monitor" the audit being conducted by

---

     [2]     "A corporation or an unincorporated association may be represented by an authorized officer of the corporation".  Rule 24(b).

respondent and to refute respondent's proposed deficiency. Respondent had substantially completed his audit of petitioner at that time, and Mr. Ozenne was called upon to negotiate with Revenue Agent Caprio, who was conducting the audit of petitioner.

When Mr. Chiate called Mr. Ozenne as a witness for petitioner, Mr. Ozenne took the witness stand, carrying with him a bundle of notes.

Mr. Chiate asked Mr. Ozenne to explain to the Court what he had done to document the fact that there was no deficiency for the year at issue. He was asked to "start from the beginning, and just explain to the Court what you've done in that respect." Counsel for respondent was otherwise occupied, and the Court asked the witness what he was referring to. The Court was informed that the witness had made notes of points that he wanted to cover in his testimony although he opined that he probably could not cover his material if Mr. Chiate did not inquire.

Mr. Chiate agreed with Mr. Ozenne's observation and then informed the Court that he would be using Mr. Ozenne's notes for examination. Respondent did not object, and the interrogation proceeded.

Mr. Ozenne testified that he met with Mr. Caprio, respondent's auditing agent, and they discussed the subject of overrings. Mr. Caprio agreed that overrings were included in respondent's determination of unreported income, and he reduced

respondent's original determination of unreported income of $380,000 to $120,371, the amount proposed in the notice of deficiency.

Mr. Ozenne then testified that, in his opinion, the $120,371 was principally due to the double-ups, discussed supra. By analyzing restaurant records from periods other than the applicable period (June 1994 through May 31, 1995), he could prove that the "$120,000" unreported income could be accounted for by showing that the entries from the bar tapes were duplicated on the entries from the back end of the restaurant where the dinner tapes included the entries on the bar tapes.

Mr. Ozenne explained his double-up theory as follows:

> Well, what I did, if you take the IRS's proposed adjustment of $120,000 and you divide by 365 days, because they were open every day except Christmas and Thanksgiving, you get an average of $328. So our contention is that approximately $328 worth of drinks every day were added to tape two (2) and to tape one (1) which are double counted.

> What we did initially is we took the day of July 2nd and we added up all the double counts on that one and it came to $183. Because that was a small group of tapes, it was probably a weekday that was slow for some reason. We also took July 14th and came up with $542 as the total for that particular day.

> So I felt that between those two, substantiating a $328 average of the prior year was within reason.

Mr. Chiate continued to lead Mr. Ozenne through their presentation of petitioner's theory of the case by asking Mr. Ozenne if, in his opinion, the dinner checks, and cash register

tapes that he examined for periods outside the applicable period, established the double-ups theory proposed by petitioner, and Mr. Ozenne agreed--<u>absolutely</u>.

Mr. Chiate further inquired of Mr. Ozenne:

Q.  Okay.  So in addition to the actual dinner checks for the period immediately after the fiscal year (the applicable period) did you determine that that was also true for the months immediately preceding the year in question?

A.  Yes.

Q.  Okay.  And did that support your opinion as to the reasonableness of concluding that double-ups account for the claimed deficiency of $120,000.

A.  For the lion's share of it.  As I said earlier, the gift certificates and the comps would have accounted for a very small part of that.  And I think the real proof of that is Ms. Groom came out and finished, I believe in May, the first part of May of 1995, <u>and the questions that arose as to the accuracy of her schedule</u>.

<u>Well, shortly after those questions arose, the bookkeeper at the restaurant instituted a procedure whereby they reconciled the total of the two adding machine tapes</u> to the daily tickets on a <u>daily basis</u>.

<u>Now that was not available in our year under audit, or prior, because no one thought it was important</u>.  [Emphasis added.]

<u>Testimony of Cecy Groom</u>

Ms. Groom is a C.P.A. who has a bachelor's degree in business administration.  She majored in accounting.  At the time of trial she was a business owner, managing and operating an International House of Pancakes (IHOP) and was also an affiliate

C.P.A. with William and Ribbs (W&R), a C.P.A. firm in Long Beach, California. She was an independent contractor with W&R. She had her own clients and shared clients with the firm. She specialized in restaurant clients because she had owned a number of national franchises such as El Pollo Loco, Sizzler and, at the time of trial, IHOP.

She became involved with DAK, Inc. in March 1995, when Dr. Shlens, the owner of the premises on which Moonshadows operated, retained her services to analyze the sales revenues. Ms. Groom was aware that, in 1991, Dr. Shlens entered into a lease with Marvin Kelson who was then the principal of DAK, Inc., to operate the restaurant for a period of 15 years. The lease provided that petitioner would pay a minimum rent of $120,000 per year. The lease also required the payment of a percentage rent of 7-1/2 percent of annual gross sales in excess of the minimum annual rental amount of $120,000.

Ms. Groom started her audit in April or May of 1995. The audit was mainly conducted on the premises of the restaurant. Before beginning her audit, Ms. Groom visited the restaurant as a patron on a number of occasions to observe the restaurant's operations. When she first began her audit, Ms. Groom met with Marvin Kelson, the restaurant's accountant and bookkeeper who formerly owned the restaurant. Mr. Kelson explained to Ms. Groom how the restaurant recorded its daily sales.

The basic source of information for recording daily sales was the meal tickets. The meal tickets were kept on a daily basis in an envelope coded by the day of the week, and the daily cash register tapes from cash registers 1 and 2 were placed in the envelope together with manual calculations prepared by Mr. Kelson to compute net daily sales in the bar area (register 2). Those are some of the records that Ms. Groom analyzed to determine the restaurant's daily net sales. Ms. Groom prepared various summaries of her findings. Those summaries were received in evidence as Exhibits 3-J through 13-J. For example, Exhibit 8-J is a summary of Ms. Groom's analysis of Moonshadows's sales for the month of November 1994. For November 18, 1994, Ms. Groom reported that sales of $3,348 were recorded on the dining area register tape (register 1), and sales of $926 were recorded on the bar area register tape (register 2).

The source of the $3,348 reported as register 1 sales was the register 1 tape given to Ms. Groom by the restaurant's accountant and bookkeeper, Mr. Kelson. The source of the $926 reported for register 2 sales was the register 2 tape and a reconciliation of the register 2 tape that was prepared by Mr. Kelson.

There was introduced into evidence Exhibit 18-R, which consisted of the above-mentioned register 1 and register 2 tapes,

together with a reconciliation of the register 2 tape prepared by Mr. Kelson.

The reconciliation of the register 2 tape showed that Mr. Kelson determined that the gross sales reported on the register 2 bar tape was $1,580.90. He then determined that the Code V (5) transactions recorded on the tape totaled $628.65. Code V transactions are the bar sales recorded on the register 2 tape that are carried over onto the register 1 tape in the dining area. Mr. Kelson deducted the $628.65 from gross sales of $1,580.90, leaving a balance of $952.25. This step in Mr. Kelson's reconciliation process eliminated any double-ups between the dining room and bar area tapes. Mr. Kelson then deducted "comps" of $12 and overrings of $14, resulting in net sales of $926.25, the amount entered by Ms. Groom as the net sales recorded on register 2. This procedure was followed by Ms. Groom during her entire audit of petitioner's taxable year ended May 31, 1995.

Petitioner contends that it carefully maintained adequate books and records for several years to determine its income. The only records the petitioner was unable to produce for examination are the records for the applicable period. Petitioner, through Messrs. Chiate and Ozenne, then fabricated a scenario orchestrated to prove that the determined unreported income of $120,371 can be explained away by showing that the entries on the

bar cash register tapes were duplicated on the dinner cash register tapes, thus accounting for the "double-ups" theory upon which petitioner relied to invalidate respondent's determination of $120,371 of unreported income.

In following Mr. Chiate's leading questions, Mr. Ozenne testified that by analyzing the restaurant's records from periods other than the applicable period (June 1994 through May 31, 1995) he could prove that the "$120,000" unreported income could be accounted for by showing that there were "double-ups" on the bar and dinner cash register tapes.

Mr. Ozenne explained the basis for his double-ups theory as follows:

> Well, what I did, if you take the IRS's proposed adjustment of $120,000 and you divide by 365 days, because they were open every day except Christmas and Thanksgiving, you get an average of $328. So our contention is that approximately $328 worth of drinks every day were added to tape two (2) and to tape one (1) which are double counted.

Having computed the amount of $328 as the base figure needed to arrive at $120,000,[3] Mr. Ozenne then incredibly explained how he arrived at a $328 day double-up:

> What we did initially is we took the day of July 2nd and we added up all the double counts on that one and it came to $183. Because that was a small group of

---

[3] To be more accurate, Mr. Ozenne should have divided $120,000 by 363 days because the restaurant was closed on Christmas and Thanksgiving Day. He would then have a base figure of $331 to work with, but the Court is confident the discrepancy would not have slowed Mr. Ozenne down.

tapes, it was probably a weekday that was slow for some reason. We also took July 14th and came up with $542 as the total for that particular day.

So I felt that between these two, substantiating a $328 average of the prior year was within reason.

As we said in Diaz v. Commissioner, 58 T.C. 560, 564 (1972):

> This case epitomizes the ultimate task of a trier of the facts--the distillation of truth from falsehood which is the daily grist of judicial life. We must be careful to avoid making the Courtroom a haven for the skillful liar or a quagmire in which the honest litigant is swallowed up. Truth itself is never in doubt, but it often has an elusive quality which makes the search for it fraught with difficulty. That this is so is clearly illustrated by the situation herein.
> * * *

We closely observed Mr. Chiate and Mr. Ozenne at trial. We find the testimony of each of them to have been contrived and untrustworthy, and we completely disregard it.

On the other hand, we found Ms. Groom to be a credible, forthcoming witness whose professionalism was evidenced by the documentation admitted at trial to credit her audit of petitioner for the applicable period.

She consulted with the restaurant's accountant and bookkeeper, Mr. Kelson (the original owner of Moonshadows). She reviewed the daily meal tickets, the daily cash register tapes from cash registers 1 (dining room) and 2 (bar), and, in particular, the manual computations prepared by Mr. Kelson on a daily basis to reconcile cash register tape 1 with cash register

tape 2.  As noted supra, the purpose of Mr. Kelson's reconciliations was to assure that, in determining net sales, no bar sales were duplicated on the dining room cash register tapes. Ms. Groom clearly demonstrated that no double-ups were included in her summaries (Exhibits 3-J through 13-J) in which she determined petitioner's income for the taxable year ended May 31, 1995.

Petitioner did not call Mr. Kelson as a witness.  He was petitioner's accountant and bookkeeper who prepared the daily cash register tape 2 (the bar) reconciliation that assured there would be no double-ups on cash register tape 1 (the dining room). Under Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), we infer that Mr. Kelson's testimony, if offered at trial, would have clearly disproved petitioner's "double-ups" theory.

Petitioner's "double-ups" theory is patently bogus, and we reject it.

Respondent determined that petitioner is liable for an accuracy-related penalty of $6,089.40 for failure to report income in the amount of $120,371.

Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment attributable to any one of various factors, one of which is negligence or disregard of rules or regulations. Sec. 6662(b)(1).  "Negligence" includes any failure to make a

reasonable attempt to comply with the provisions of the Internal Revenue Code, including any failure to keep adequate books and records or to substantiate items properly.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion.  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case by case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year.  Id.; Neely v. Commissioner, 85 T.C. 934, 947 (1985).  We find that petitioner was negligent and lacked due care in preparing its Federal income tax return for the year ended May 31, 1995.  We are confident that petitioner was aware that its accountant and bookkeeper, Mr. Kelson, on a daily basis, reconciled cash register tapes 1 and 2 to eliminate any "double-ups".  Respondent is sustained on this issue.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.