# United States Tax Court

T.C. Memo. 2025-80

ADRIENNE MENNEMEYER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 10128-23.                          Filed July 28, 2025.

————

*James A. Kutten*, for petitioner.

*Jamie M. Powers*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*: Pursuant to section 6213(a),[1] petitioner, Adrienne Mennemeyer, seeks redetermination of a deficiency in federal income tax determined by the Internal Revenue Service (IRS) for the 2018 taxable year. After concessions, the issues for decision are whether (1) the limitation period expired before the issuance of the Notice of Deficiency (NOD), dated March 15, 2023; (2) Ms. Mennemeyer had unreported income as a result of an arbitration settlement; (3) certain purported business expenses can be deducted as ordinary and necessary

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

**[\*2]** business expenses; and (4) Ms. Mennemeyer is liable for an addition to tax, under section 6651(a)(1), for failure to timely file her return.[2]

For the reasons set forth below, we will sustain the Commissioner's deficiency and addition to tax determinations, as limited by the parties' concessions, stipulations, and this Opinion.

FINDINGS OF FACT

The trial in this case took place during a St. Louis, Missouri, trial session. We incorporate by this reference the Stipulation of Facts, Supplemental Stipulation of Facts, the Stipulated Exhibits, and any Exhibits admitted at trial and in the Court's posttrial Orders.

Ms. Mennemeyer resided in Missouri when she timely petitioned this Court.

I.    *PNC Employment, Arbitration, and Settlement*

Ms. Mennemeyer started working at Edward Jones in 2005, where she was eventually promoted and became a financial advisor. She also obtained her securities license and insurance license. Eventually, Ms. Mennemeyer was recruited by PNC Investments LLC, a subsidiary of PNC Bank, National Association (collectively PNC), in Wentzville, Missouri.

Ms. Mennemeyer began working at PNC in 2012 as a financial sales consultant. From approximately February 2013 through December 12, 2013, she worked as a financial specialist, handling investments.

Ms. Mennemeyer's employment was marred by a difficult work environment, and she was terminated on December 12, 2013. On December 23, 2014, PNC filed a document—known as a U5—with the Financial Industry Regulatory Authority (FINRA) stating that Ms. Mennemeyer was dishonest and indicating that her dishonesty led to her termination.

As a result, Ms. Mennemeyer had difficulty obtaining further employment in the securities industry. Thus, on December 3, 2015, she filed a Statement of Claim with FINRA, *Adrienne Mennemeyer v. PNC*

---

[2] The IRS concedes that Ms. Mennemeyer is not liable for a section 6662(a) penalty for taxable year 2018.

**[\*3]** *Investments LLC*, FINRA Arbitration Dispute Case No. 15-03275 (FINRA Arbitration).

In the FINRA Arbitration, Ms. Mennemeyer asserted claims for defamation, wrongful termination, unfair competition, tortious interference with business expectancy, and expungement. She did not make any claims related to health concerns, other than to note that she had suffered emotional and psychological harm as a result of PNC's actions.

Following the FINRA Arbitration, Ms. Mennemeyer was awarded $300,000 in compensatory damages and $1,500,000 in punitive damages (Arbitration Award). The Arbitration Award specifically stated that its "recommendations are based on the defamatory nature of the information" in the U5.

On May 18, 2017, PNC filed a Petition to Vacate Arbitration Award in *PNC Investments, LLC v. Mennemeyer*, No. 17-cv-01535, in the U.S. District Court for the Eastern District of Missouri (District Court Litigation). In April of 2018 Ms. Mennemeyer and PNC reached a settlement agreement with respect to the FINRA Arbitration and the District Court Litigation.

The Confidential Settlement Agreement and General Release (Settlement Agreement) stated that PNC agreed to pay Ms. Mennemeyer $1,510,000, to be paid via two checks. Ms. Mennemeyer was paid $997,466, and her attorneys were paid $512,534. The Settlement Agreement does not mention any health concerns or physical injuries. Rather, it includes a general release related to Ms. Mennemeyer's "employment and/or termination of employment with PNC." Further, the preamble to the document makes clear that the settlement relates to the FINRA Arbitration and causes of action related thereto. In executing the Settlement Agreement, Ms. Mennemeyer agreed that she had no other claims or lawsuits against PNC.

II.    *Olive Tree Enterprises*

Ms. Mennemeyer did not return to the securities industry. In 2018, she owned and operated Olive Tree Enterprises LLC (also known as Olive Tree Market Place and hereinafter referred to as Olive Tree), a single member disregarded entity taxable as a sole proprietorship. During the 2018 taxable year, Olive Tree was an antique mall type of business in Wentzville, Missouri; that location closed in 2023.

[*4]    The retail space in 2018 spanned approximately 4,000 square feet with subdivided spaces of approximately 100 square feet. There Ms. Mennemeyer sold her own goods, rented floor space to vendors who sold their goods, and sold other goods on consignment. As to goods sold by other vendors, Olive Tree retained 10% of the proceeds.

Ms. Mennemeyer also sold used goods that she purchased at estate sales, garage sales, and auctions. Sometimes she would improve these goods, such as by fixing broken drawers or painting them. These goods were typically purchased with cash, and Ms. Mennemeyer admits that she did a poor job of tracking these cash expenditures. In the latter half of 2018 Ms. Mennemeyer purchased new goods to sell, but she does not have receipts for all purchases.

On November 1, 2018, Ms. Mennemeyer purchased a Chevrolet Suburban for $54,481 to use at Olive Tree. The Suburban weighs 7,500 pounds and is built on a truck chassis. Ms. Mennemeyer purchased the Suburban to pick up merchandise, haul goods, and deliver furniture for Olive Tree. She maintained a separate vehicle that served as her personal vehicle, but on occasion she also used her personal vehicle for business during the 2018 taxable year. She does not have any logs or contemporaneous records related to the use of either vehicle.

Ms. Mennemeyer is in a romantic relationship with John Burns. Mr. Burns is a certified public accountant and serves as her accountant. He prepares Olive Tree's books and records, including those for the 2018 taxable year. According to Mr. Burns, he calculated Olive Tree's cost of goods sold (COGS) by reviewing bank statements and then creating a general ledger of the purported COGS. Ms. Mennemeyer did not provide detailed testimony regarding the source of information in the general ledger for Olive Tree. According to her, she does not manage her books and leaves that to Mr. Burns.

III.    *Health Concerns*

At some point—purportedly during her employment at PNC—Ms. Mennemeyer began experiencing health concerns, including a rash and fatigue. It is unclear what caused these ailments, precisely when they began occurring, or the severity of her purported illness. Ms. Mennemeyer testified that she began experiencing changes in her health while working at PNC. But she also testified that, during that time, she was involved in a contentious divorce and was receiving threats from her former spouse about child custody. In addition, the

**[\*5]** record establishes that Ms. Mennemeyer's relationship with Mr. Burns may have also been contentious during her employment with PNC.

Ms. Mennemeyer did not produce any medical records related to 2013 or 2014, when these health changes purportedly began. Although she produced pictures of her feet and legs to show her ailments, these photographs are undated and were purportedly taken in 2017—years after her time at PNC ended.

Ms. Mennemeyer's former coworker Coreen Marnett testified that Ms. Mennemeyer "was not the same person" after being fired. She also testified that Ms. Mennemeyer had lower extremity redness and swelling. According to Mr. Burns, Ms. Mennemeyer's health concerns began at some point in 2013 and continue to date. No experts testified about the source of Ms. Mennemeyer's ailments, including whether they were caused by PNC's actions or other situational stressors in her life at the time.

With respect to the settlement with PNC, Ms. Mennemeyer claims that the settlement was related, at least in part, to her health concerns. She also claims that PNC forced her to waive any future lawsuit, including additional damages she would have sought for her physical health. According to her, the settlement agreement was signed with the understanding that she was waiving any future claims for health concerns resulting from her employment. Mr. Burns also testified that PNC was attempting to avoid another lawsuit related to Ms. Mennemeyer's health, but it is unclear what personal knowledge he has regarding PNC's motives. There are no contemporaneous records or other evidence to support Ms. Mennemeyer's claims.

IV.    *2018 Tax Return and Examination*

Ms. Mennemeyer's 2018 income tax return was due on April 15, 2019. She was aware of the due date and had never previously filed a late return. On October 15, 2019, she filed Form 1040, U.S. Individual Income Tax Return, for the 2018 taxable year (2018 Return).

According to Mr. Burns, on February 28, 2019, an employee at his office submitted the application for an extension of time for Ms. Mennemeyer to file the 2018 Return. Ms. Mennemeyer produced a purported copy of Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return, with a handwritten notation stating: "MAILED 2/28/19 USPS – LH." However, Mr. Burns

**[\*6]** did not personally witness the mailing, nor could he find any receipts proving that the document was mailed.

According to Ms. Mennemeyer, she retained a tax attorney to help her with the 2018 Return because she needed legal advice related to reporting the settlement award. That tax attorney, Nathaniel Landman, prepared the 2018 Return, with some assistance from Mr. Burns, who provided the general ledger for Olive Tree. Ms. Mennemeyer reported $498,733 of the PNC award—roughly half of what she received—as taxable income, because her tax attorney purportedly determined that was the amount she was required to include on the 2018 Return.

The 2018 Return also included a Schedule C, Profit or Loss From Business, for Olive Tree, reporting gross receipts of $194,942.[3] The Schedule C also reported $234,344 in COGS and expenses totaling $177,426, resulting in a loss of $216,828 for the 2018 taxable year.

The IRS initiated an examination into Ms. Mennemeyer's 2018 Return. On April 2, 2022, the parties signed Form 872, Consent to Extend the Time to Assess Tax. On the Form 872, they agreed to extend the period for assessment through October 15, 2023.

On March 15, 2023, the IRS determined a deficiency of $588,906, an addition to tax of $164,389 pursuant to section 6651(a)(1), and a penalty of $117,444 pursuant to section 6662(a). As for the addition to tax, the IRS stated that Ms. Mennemeyer did not file the 2018 Return or a request for extension within the time prescribed by law.

The deficiency determination was based, in large part, on the settlement Ms. Mennemeyer received from PNC. Those proceeds account for the lion's share of the increase of Ms. Mennemeyer's taxable income from $274,175 to $1,858,000.

In addition, the NOD disallowed deductions for several expenses for Olive Tree. The NOD proposed the following adjustments to Olive Tree's business expenses:

---

[3] The parties stipulated that Olive Tree reported gross receipts totaling $194,912, which is less than the amount reported on the Schedule C. The discrepancy has no impact on the resolution of this case. But for the sake of completeness, we note that the Court is not bound by a stipulation of fact that appears contrary to the facts disclosed by the record. *See* Rule 91(e); *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976).

[*7]

| Expense | Amount |
|---|---|
| Wages | ($57,608) |
| Other Expenses | 1,800 |
| Taxes and Licenses | 5,045 |
| Depreciation and § 179 Expense | 50,576 |
| Car and Truck | 40,415 |
| Cost of Goods Sold | 234,344 |

The section 179 expense is for the Suburban, which Ms. Mennemeyer claimed on Form 4562, Depreciation and Amortization.

Ms. Mennemeyer concedes she had unreported wage income of $18,000 for the 2018 taxable year. She also concedes that the "IRS taxes and licenses adjustment [$5,045] is correct" for the 2018 taxable year. Respondent concedes that Ms. Mennemeyer is entitled to a Schedule C deduction for wages totaling $58,816 for the 2018 taxable year, rather than $57,608 as shown in the NOD.

Further, after trial the parties filed a Supplemental Stipulation of Facts (Doc. 30). Therein, they stipulated to some items under COGS, consisting of $36,638 tied to the Olive Tree general ledger and $11,791 not reflected in the general ledger, totaling $48,429 in stipulated COGS. The remaining Olive Tree COGS items Ms. Mennemeyer claimed on the 2018 Return remain in dispute, consisting of $24,260 identified by invoice and approximately $161,654 for which an invoice was not provided. Thus, approximately $185,915 in claimed COGS remains in dispute.

OPINION

I. *Burden of Proof*

The determinations in a notice of deficiency bear a presumption of correctness, *see Welch v. Helvering*, 290 U.S. 111, 115 (1933), and the taxpayer generally bears the burden of proving them erroneous in proceedings in this Court, *see* Rule 142(a)(1). The taxpayer also bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

**[\*8]** II.     *Evaluation of Evidence*

In deciding whether a taxpayer has carried her burden of proof, witness credibility is an important consideration. *Ishizaki v. Commissioner*, T.C. Memo. 2001-318, 2001 WL 1658189, at \*7. "[T]he distillation of truth from falsehood . . . is the daily grist of judicial life." *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972). "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." *Kropp v. Commissioner*, T.C. Memo. 2000-148, 2000 WL 472840, at \*3.

Generally, we found Ms. Mennemeyer's testimony credible. In contrast, we found Mr. Burns's testimony self-serving and lacking in candor, particularly as it related to the source of Ms. Mennemeyer's health concerns and the Form 4868. Relatedly, Ms. Mennemeyer's witnesses lacked personal knowledge regarding the cause of her ailments, including whether her health concerns were caused by her employment conditions at PNC.

We will now turn to the issues for decision.

III.     *Limitation Period*

Despite signing a request for an extension of time to file the 2018 Return, Ms. Mennemeyer claims that the limitation period for assessment expired before the Commissioner determined a deficiency for the taxable year at issue. Thus, we first examine whether the limitation period expired before the Commissioner issued the NOD.

The Commissioner must generally assess income tax within three years of the filing date of the return for that year. *See* § 6501(a). But the Commissioner and a taxpayer can agree to extend the limitation period by executing a written agreement signed by both parties before the expiration of the statutory period. *See* § 6501(c)(4). If a taxpayer makes a prima facie showing that the statute of limitations bars an assessment, the Commissioner must show that the parties executed a written consent, valid on its face, extending the limitation period for assessment, and that the Notice of Deficiency was mailed before the expiration of the extended period. *Adler v. Commissioner*, 85 T.C. 535, 540–41 (1985). "A consent is valid on its face if it identifies the taxpayers, bears their signatures, identifies the year, and is dated prior to the expiration of the existing limitations period." *Kim v. Commissioner*, T.C. Memo. 1996-142, 1996 WL 121242, at \*2.

**[*9]**    Assuming without deciding that Ms. Mennemeyer made a prima facie showing, we conclude that the Commissioner has established each of the elements necessary to demonstrate that the limitation period for assessment was extended. The parties signed an agreement to extend the period through October 15, 2023. This extension was in effect on March 15, 2023, when the Commissioner issued the NOD for the 2018 taxable year. Further, the Form 872 is valid on its face and signed by both parties. *See id.*; *Harber v. Commissioner*, T.C. Memo. 1992-707, 1992 WL 367758, at *6 (observing that the burden of proof in establishing that the limitation period has expired rests with the taxpayer); *Ribb v. Commissioner*, T.C. Memo. 1988-379, 1988 WL 83925, at *3 ("When a consent appears regular on its face and in accordance with the law, we generally presume that the party who signed it on behalf of [the Commissioner] acted within the scope of his authority.").

Once the IRS introduces a timely consent that is valid on its face, and the taxpayer asserts that the consent was ineffective, then the taxpayer is required to prove the invalidity of the consent. *Amesbury Apartments, Ltd. v. Commissioner*, 95 T.C. 227, 241 (1990); *see also Three G Trading Corp. v. Commissioner*, T.C. Memo. 1988-131, 1988 Tax Ct. Memo LEXIS 159, at *8 ("[A]n agreement extending the [period] of limitations need not be executed perfectly . . . ."). For the reasons set forth in our posttrial Order (Doc. 28), Ms. Mennemeyer has failed to do so here. Accordingly, the Court finds that the limitation period had not expired at the time the Commissioner issued the NOD.

IV.    *Settlements Under Section 104(a)*

A.    *The Settlement Proceeds*

Gross income includes all income from whatever source derived, including income derived from a settlement agreement. *See* § 61(a); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–31 (1955); *see also Blum v. Commissioner,* T.C. Memo. 2021-18, at *7–8. However, section 104(a)(2) excludes from gross income "the amount of any damages . . . received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." Personal physical injury or physical sickness excludes emotional distress.[4] *See* § 104(a) (flush language).

---

[4] The flush text of section 104(a) provides that the general rule against exclusion of emotional-distress damages does not apply to "the amount paid for medical

**[\*10]** Damages are *on account of* personal physical injuries or physical sickness if there is a direct causal link between the action giving rise to the damages and the physical injury or physical sickness. *Blum*, T.C. Memo. 2021-18, at \*7–8 (citing *Doyle v. Commissioner*, T.C. Memo. 2019-8, at \*11), *aff'd*, No. 21-71113, 2022 WL 1797334 (9th Cir. June 2, 2022); *see also Rivera v. Baker W., Inc.*, 430 F.3d 1253, 1257 (9th Cir. 2005). Personal injuries are not enough. Congress amended the gross income exclusion under section 104(a)(2) in 1996 to include *only* "physical" personal injuries. Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1605(b), 110 Stat. 1755, 1838.

When damages are received pursuant to a settlement agreement, the nature of the claim that gave rise to the settlement controls whether the damages are excludable under section 104(a)(2). *See United States v. Burke*, 504 U.S. 229, 237 (1992). To determine the nature of the claim, we look first to the express terms of the agreement. *Rivera*, 430 F.3d at 1257. However, "[i]f the agreement lacks express language specifying the purpose of the compensation, we will then examine the intent of the payor." *Id.*

Under the terms of the Settlement Agreement, PNC compensated Ms. Mennemeyer for a broad release of claims, both known and unknown. But the general release clearly relates to Ms. Mennemeyer's "employment and/or termination of employment with PNC" and the FINRA Arbitration.

Ms. Mennemeyer contends that PNC was concerned about a second lawsuit related to her purported health ailments. But the record does not support Ms. Mennemeyer's claims or her reading of the Settlement Agreement. The agreement does not mention personal injuries, nor is there any indication that the settlement was for *physical* injuries. While Ms. Mennemeyer claimed that PNC entered into the settlement to foreclose any future action she might have for physical injuries, her testimony amounts to no more than her belief. For that reason, we give it little, if any, weight.

We do not find the Settlement Agreement ambiguous. But even if we look beyond the Settlement Agreement, the surrounding facts and circumstances also show that PNC compensated Ms. Mennemeyer for defamation and economic damages, not personal physical injuries or

---

care" attributable to emotional distress. Ms. Mennemeyer does not raise this issue, and we do not consider it further.

**[*11]** physical sickness. Ms. Mennemeyer was represented by counsel when she pursued her claims, which focused exclusively on defamation and the economic impact of losing her job. She did not make any claims related to health concerns, other than to note that she had suffered emotional and psychological harm, which is excluded from physical injuries. *See* § 104(a) (flush language). Relatedly, the Arbitration Award makes clear that the award was "based on the defamatory nature of the information" in the U5, further underscoring that Ms. Mennemeyer's claims are not related to physical injuries.

Thus, the facts and circumstances surrounding the Settlement Agreement overwhelmingly demonstrate that the settlement was to resolve defamation and related economic claims, not to seek compensation for a personal physical injury or physical illness. Because Ms. Mennemeyer did not receive the settlement award on account of personal physical injuries or physical sickness, she must include that amount in gross income.

B.    *Attorney's Fees*

When a litigant's recovery constitutes taxable income, that income includes the portion of the recovery paid to the litigant's attorney. *Commissioner v. Banks*, 543 U.S. 426 (2005); *see also Williams v. Commissioner*, T.C. Memo. 2005-29, 2005 WL 375471, at *3 ("The contingency fee portion of [the taxpayers'] settlement is includable in their gross income, and the tax consequences cannot be avoided by assignment of a portion of the settlement to pay legal fees.").

The Settlement Agreement makes clear that PNC "agree[d] to pay Mennemeyer" $1,510,000, which was paid in two separate checks: one to her and one to her attorneys. Therefore, even though a portion of Ms. Mennemeyer's settlement was paid to her attorneys, the entire settlement is recognized as gross income to Ms. Mennemeyer for 2018. *See Johnson v. Commissioner*, T.C. Memo. 2009-156, 2009 WL 1855767, at *4.

As an alternative position, Ms. Mennemeyer argues that "if the contingency attorney fee is taxable to petitioner, the attorney fee is deductible as an above-the-line deduction." In general, section 62(a)(20) permits an above-the-line deduction from gross income "for attorney fees and court costs paid by, or on behalf of, the taxpayer in connection with any action involving a claim of unlawful discrimination." *See George v. Commissioner*, T.C. Memo. 2016-156, at *11.

**[\*12]** Unlawful discrimination is defined under section 62(e) and means an unlawful act under a number of specific federal statutes, *see* § 62(e)(1)–(17), as well as "[a]ny provision of Federal, State, or local law . . ."—

> (i) providing for the enforcement of civil rights, or
> (ii) regulating any aspect of the employment relationship, including claims for wages, compensation, or benefits, or prohibiting the discharge of an employee, the discrimination against an employee, or any other form of retaliation or reprisal against an employee for asserting rights or taking other actions permitted by law.

*See* § 62(e)(18); *see also Commissioner v. Banks*, 543 U.S. at 433.

Respondent did not address Ms. Mennemeyer's alternative position and therefore has waived the argument. *See Rose v. Commissioner*, T.C. Memo. 2019-73, at \*35–36. Moreover, we find that Ms. Mennemeyer's claims against PNC fall within the broad category set forth in section 62(e)(18)(ii). Specifically, Ms. Mennemeyer's claims against PNC related to her employment relationship with PNC and her claim for lost wages. Accordingly, the parties shall consider section 62(a)(20) when they recalculate the deficiency under Rule 155. *See Dern v. Commissioner*, T.C. Memo. 2022-90, at \*3 n.3 (noting that the Commissioner conceded that the taxpayer was entitled to deduct attorney's fees and court costs in connection with claim against former employer).

V.    *Business Expenses*

A.    *Analytical Framework*

Deductions are a matter of legislative grace, and the taxpayer bears the burden of clearly showing entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84. Under that burden, the taxpayer must substantiate the amount and the purpose of the expense underlying the deduction. *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001). A taxpayer must also maintain adequate records to demonstrate the propriety of any deduction claimed. *Id.*; *see also* § 6001.

Section 162(a) permits a deduction for ordinary and necessary expenses paid to carry on a trade or business during the taxable year. An "ordinary" expense is one that is common and acceptable in the particular business. *Welch v. Helvering*, 290 U.S. at 113–14. Moreover,

**[\*13]** the main function of the word "ordinary" in section 162(a) is to clarify the distinction between expenses that are currently deductible and expenses that are capital. *Commissioner v. Tellier*, 383 U.S. 687, 689–90 (1966). A "necessary" expense under section 162(a) is an expense that is appropriate and helpful in carrying on the trade or business. *Heineman v. Commissioner*, 82 T.C. 538, 543 (1984).

If a taxpayer is unable to substantiate the amount of a deduction, the Court may nonetheless allow it (or a portion thereof) if there is an evidentiary basis for doing so. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). In estimating the amount of an allowable expense under the *Cohan* rule, the Court bears heavily against the taxpayer whose inexactitude is of his own making. *Cohan v. Commissioner*, 39 F.2d at 543–44. The *Cohan* rule cannot be applied to deductions subject to the strict substantiation requirements of section 274(d). *See Sanford v. Commissioner*, 50 T.C. 823, 828 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969); Temp. Treas. Reg. § 1.274-5T(a) (flush language). Certain expenses otherwise deductible under section 162(a) are subject to heightened substantiation requirements under section 274(d); these include expenses for traveling and expenses with respect to any listed property under section 280F(d)(4). *See* § 274(d)(1), (3).

With these general principles in mind, we will address Ms. Mennemeyer's disputed business expenses for Olive Tree: (1) COGS; (2) motor vehicle purchase; and (3) car and truck expenses. We will take each of these expense categories in turn.[5]

B.     *Cost of Goods Sold*

First, the parties dispute the amount of Olive Tree's COGS. Ms. Mennemeyer claims that records regarding the COGS were maintained as part of the general ledger, which was created by Mr. Burns. She reported COGS totaling $234,344 on Olive Tree's Schedule C. Citing a lack of substantiation, the NOD disallowed the entire amount of the COGS claimed on Schedule C for Olive Tree.

As an initial matter, the general ledger Ms. Mennemeyer provided totals less than half of the reported COGS. Further, Ms.

---

[5] Ms. Mennemeyer's Opening Brief does not address the NOD's adjustments to Schedule C Gross Receipts, Wages, and Other Expenses. Thus, to the extent not discussed in the Opening Brief, adjustments shown in the NOD to Schedule C are deemed conceded by Ms. Mennemeyer. *See Rose*, T.C. Memo. 2019-73, at \*35–36.

**[\*14]** Mennemeyer purports to provide an analysis of Olive Tree expenditures, matching the general ledger to documents in the record. However, a majority of these expenditures are tied to bank records, not receipts. Those bank records were not provided as part of this litigation. After trial, the parties stipulated to some of the COGS items, consisting of $36,638 tied to the Olive Tree general ledger and $11,791 not reflected in the general ledger, totaling $48,429 in stipulated COGS.

The remaining disputed Olive Tree COGS items, totaling approximately $185,915, are not supported by evidence in the record. Although a few invoices remain, to which respondent did not stipulate, Ms. Mennemeyer did not provide any testimony regarding the bases of those purported expenses. Nor is it clear how the purported expenses relate to Olive Tree's COGS. Moreover, some invoices appear to be duplicative or are illegible. Or they lack the clarity to demonstrate that the expenses were incurred during the 2018 taxable year. Accordingly, Ms. Mennemeyer has failed to substantiate the remaining disputed COGS.

Ms. Mennemeyer acknowledges that she did not maintain records for cash purchases yet asks the Court to apply the *Cohan* rule. But the *Cohan* rule requires the taxpayer to produce sufficient evidence upon which we may base an estimate of deductible expenses. *Vanicek*, 85 T.C. at 743. Ms. Mennemeyer did not keep records for cash purchases and has not provided sufficient evidence for us to estimate the total Olive Tree COGS attributable to cash purchases in 2018. Additionally, the significant mismatch between the invoice totals and the transactions reflected in the general ledger leads us to conclude that the ledger is not a reliable source for estimating Olive Tree's COGS. Accordingly, we find that Ms. Mennemeyer has failed to adequately substantiate the COGS claimed on Olive Tree's Schedule C for taxable year 2018, except to the extent stipulated by the parties.

C.     *Motor Vehicle Purchase*

Next, the parties dispute whether the purchase of the Suburban is a deductible business expense. When property is used in a trade or business, the taxpayer may be allowed a depreciation deduction. *See* §§ 161, 167, 179. To substantiate entitlement to a depreciation deduction, a taxpayer must establish the trade or business use of the property and its depreciable basis by showing the cost of the property, its useful life, and the previously allowable depreciation. *Cluck v. Commissioner*, 105 T.C. 324, 337 (1995); *Schnackel v. Commissioner*,

**[\*15]** T.C. Memo. 2024-76, at \*9–10. Although Ms. Mennemeyer relied upon section 179 on the 2018 Return, she argues on brief that depreciation on the Suburban is deductible under section 168(k).

Section 179 permits taxpayers to elect to deduct the full cost of section 179 property for the year it is placed in service. § 179(a). Section 179 property includes tangible property to which section 168 applies. § 179(d)(1)(A)(i). To the extent the property is used for nonbusiness purposes, the deduction is permitted for the portion of the cost of the property attributable to the trade or business use. Treas. Reg. § 1.179-1(d)(1). No deduction is permitted under section 179 where less than 50% of the property's use is for trade or business purposes. Treas. Reg. § 1.179-1(d)(1).

To determine the annual wear and tear of tangible property, the Code generally requires taxpayers to use the modified accelerated cost recovery system outlined in section 168. But under section 168(k)(1)(A) the depreciation deduction provided by section 167 includes a first-year special allowance (bonus depreciation) for qualified property acquired and placed in service before January 1, 2027. § 168(k)(2)(A)(iii). "Qualified property" includes any tangible property with a recovery period of 20 years or less. § 168(k)(2)(A)(i)(I). Automobiles have a recovery period of five years. § 168(e)(3)(B). Property for which trade or business use does not exceed 50% of its total use is not "qualified property." §§ 168(k)(2)(D), 280F(b)(1), (3).

Further, section 274(d) provides that, unless the taxpayer complies with certain strict substantiation rules, no deduction is allowable for listed property, which includes "any passenger automobile" and "any other property used as a means of transportation." *See* § 280F(d)(4)(A)(i) and (ii). The term "passenger automobile" means any four-wheeled vehicle that is manufactured primarily for use on public streets, roads, and highways and is rated at 6,000 pounds gross vehicle weight or less in the case of a truck or van. § 280F(d)(5). Ms. Mennemeyer and Mr. Burns testified credibly that the Suburban weighs more than 6,000 pounds. Thus, the Suburban is excepted from the definition of "passenger automobile." *See* § 280F(d)(5).

Nevertheless, the "catchall" provision of section 280F(d)(4)(A)(ii)—relating to any other property used as a means of transportation—applies. Property used as a means of transportation includes any vehicle "for transporting persons or goods." Treas. Reg. § 1.280F-6(b)(2). Ms. Mennemeyer purchased the Suburban to collect

[*16] merchandise, haul goods, and deliver furniture for Olive Tree. Thus, the Suburban was property used as a means of transporting goods and is listed property.

Respondent concedes the price of the Suburban and its purchase date. Respondent's only dispute appears to be that Ms. Mennemeyer did not meet heightened substantiation requirements. Generally, section 274(d) provides that no deductions are allowed for listed property unless substantiated with supporting documents showing the purchase price, date purchased, and the extent to which the vehicle was used for business purposes. *See also Factor v. Commissioner*, T.C. Memo. 2023-39, at *4–5.

Although we found credible Ms. Mennemeyer's testimony that the Suburban was purchased for use at Olive Tree, she has failed to meet the heightened substantiation requirements for listed property because she failed to provide sufficient contemporaneous evidence corroborating her testimony that the suburban was predominantly used for a business purpose. Accordingly, we will sustain the Commissioner's disallowance of a deduction for the Suburban's purchase price. *See* § 274(d); Treas. Reg. § 1.179-1(d); *see also Schnackel*, T.C. Memo. 2024-76, at *10–11; *DeLima v. Commissioner*, T.C. Memo. 2012-291, at *16 (finding with no doubt that the taxpayer used a vehicle for business purposes, yet having no choice but to deny the vehicle expense deduction because she failed to follow the requirements of section 274(d) and its related regulations).

D.    *Car and Truck Expenses*

Finally, the parties dispute whether Ms. Mennemeyer is entitled to deduct additional car and truck expenses. Ms. Mennemeyer acknowledges that she did not maintain mileage or cost records related to vehicle expenses, but she nevertheless requests that the Court apply the *Cohan* rule to allow a deduction for vehicle operating expenses. However, the *Cohan* rule is inapplicable to any listed property, including property used as a means of transportation. *See* § 274(d); *see also Parker v. Commissioner*, T.C. Memo. 2021-111, at *10. Accordingly, in the absence of any documentary evidence related to the car and truck expenses, Ms. Mennemeyer has failed to adequately substantiate the car and truck expense deduction claimed on Olive Tree's Schedule C for taxable year 2018. *See Wolpert v. Commissioner*, T.C. Memo. 2022-70, at *6–7.

**[\*17]** VI.    *Addition to Tax for Failure to Timely File*

Next, we must determine whether Ms. Mennemeyer is liable for an addition to tax for failure to timely file her return. The due date for Form 1040 income tax returns for taxable year 2018 was April 15, 2019. *See* § 6072(a). An individual taxpayer is granted an automatic six-month extension of the filing due date, provided the taxpayer (1) submits a complete application on Form 4868; (2) files the application by the date prescribed for filing the return with the IRS office designated in the application instructions; and (3) shows the full amount properly estimated as tax for the taxable year. Treas. Reg. § 1.6081-4(b).

If a taxpayer does not timely file a tax return, the Commissioner may impose an addition to tax for failure to timely file, unless it is shown that the failure was due to reasonable cause and not willful neglect. § 6651(a)(1). To the extent that a taxpayer asserts reasonable cause for failing to timely file a return, she has the burden of proof. *Higbee*, 116 T.C. at 446.

The record establishes that the 2018 Return was due on April 15, 2019, and Ms. Mennemeyer was aware of the due date. On October 15, 2019, Ms. Mennemeyer filed the 2018 Return. There is no evidence that the IRS received Form 4868. Thus, respondent has come forward with sufficient evidence indicating that it is appropriate to impose the section 6651(a)(1) addition to tax and has met his burden of production. *See* § 7491(c); *Higbee*, 116 T.C. at 446–47. Ms. Mennemeyer now must come forward with evidence sufficient to persuade the Court that respondent's determination is incorrect. *See Higbee*, 116 T.C. at 447; *see also Laidlaw v. Commissioner*, T.C. Memo. 2017-167, at \*22–24. We hold that she has failed to do so.

According to Mr. Burns, an employee at his office submitted Form 4868 to apply for an extension of time for Ms. Mennemeyer to file the 2018 Return. However, Mr. Burns did not personally witness the mailing, nor could he find any receipts proving that the document was mailed. Ms. Mennemeyer produced a purported copy of Form 4868, with a handwritten notation stating: "MAILED 2/28/19 USPS – LH." But the documentary evidence offered is insufficient to corroborate that the Form 4868 was mailed. It is not clear what happened to Ms. Mennemeyer's Form 4868, or even whether it was mailed. But by not mailing the document by registered or certified mail, Ms. Mennemeyer assumed the risk of nondelivery. *See Laidlaw*, T.C. Memo. 2017-167, at \*24 (citing *Walden v. Commissioner*, 90 T.C. 947, 952 (1988)).

**[\*18]** Accordingly, Ms. Mennemeyer has failed to carry her burden of proof, and she is liable for an addition to tax under section 6651(a)(1) for failing to timely file her 2018 Return.

VII.    *Conclusion*

On the basis of the foregoing and concessions by the parties, we sustain the Commissioner's deficiency and addition to tax determinations, as set forth herein. In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*